TRIGO HERMANOS, INC. y BENIGNO TRIGO ORBETA, demandantes y apelados, *v.* SOBRINO DE IZQUIERDO, INC., demandada y apelante.

Núm. 10215.—*Sometido:* Diciembre 6, 1950.—*Resuelto:* Abril 24, 1951.

---

*Miranda Esteve* y *Martínez Álvarez, Jr.,* abogados de la apelante; *McConnell & Valdés,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

A petición de Trigo Hermanos, Inc. y Benigno Trigo Orbeta, el Tribunal de Distrito de San Juan expidió un auto de *injunction* preliminar en contra de la demandada Sobrino de Izquierdo, Inc. en el cual expuso, sucintamente, las razones para su expedición—Regla 65 (*d*) de las de Enjuiciamiento Civil—en esta forma:

"POR CUANTO: Se ha probado a satisfacción de este Tribunal que el día 14 de enero de 1948 la mercantil Pedro Domecq S. A. nombró al aquí demandante Benigno Trigo Orbeta agente

concesionario exclusivo para la Isla de Puerto Rico, y al momento de nombrar a su agente fijó una lista de precios de los productos Domecq para el territorio cubierto por la agencia.

"POR CUANTO: Se ha probado asimismo, a satisfacción de este Tribunal, que el aquí demandante Benigno Trigo Orbeta nombró a la otra aquí demandante Trigo Hermanos, Inc., distribuidora exclusiva de los productos Domecq para el territorio cubierto por la agencia.

"POR CUANTO: Se ha probado además, a satisfacción del Tribunal, que la aquí demandada Sobrino de Izquierdo, Inc., ha adquirido de la distribuidora de los productos Domecq en la ciudad de Nueva York determinadas partidas de brandy, *con una etiqueta distinta a la etiqueta autorizada por Pedro Domecq S. A. para el territorio de Puerto Rico, cuyas partidas ha vendido en todo o en parte a precios más bajos de los precios establecidos por el agente concesionario exclusivo de dichos productos en la Isla de Puerto Rico.*

"POR CUANTO: Dicha práctica comercial constituye un actc de competencia desleal prohibida por la sección 3 de la Ley número 147 de 15 de mayo de 1937 de la Asamblea Legislativa de Puerto Rico, titulada 'Ley para proteger a los dueños o poseedores de marcas de fábrica (*trade marks*), distribuidores de mercaderías y al público en Puerto Rico, contra prácticas comerciales desleales en la distribución de artículos de comercio de calidad modelo (*standard*) bajo marcas registradas o tipos de calidad y nombre; para autorizar la inclusión de ciertas disposiciones en los contratos relativos a la venta o reventa de artículos objeto de comercio; proveer remedios y para otros fines'.

"POR TANTO: Por la presente se le ordena a la demandada Sobrino de Izquierdo, Inc. que se abstenga de realizar venta alguna de los productos de la mercantil Pedro Domecq S. A., *con etiqueta distinta a la autorizada para la venta de dichos productos en Puerto Rico y a precios distintos que los autorizados por el fabricante y por su agente exclusivo en dichos territorios,* debiendo cesar dicha demandada en la venta de los productos referidos hasta ulterior orden de este Tribunal y bajo apercibimiento de desacato.

"Los peticionarios deberán prestar una fianza a favor de la demandada Sobrino de Izquierdo, Inc. por la cantidad de

$2,000 (dos mil dólares) cuya fianza deberá ser aprobada por este Tribunal antes de entrar en vigor el injunction preliminar aquí decretado." (Bastardillas nuestras.)

La demandada solicitó reconsideración, y denegada que fué su moción, apeló y sostiene en su alegato que el tribunal inferior erró al expedir el entredicho; al declararse con jurisdicción para expedirlo,[1] y al expedir el injunction preliminar, apreciando erróneamente la evidencia.

■ ·Las cuestiones planteadas por la apelante en relación con la expedición del entredicho, aun cuando tuvieran algún mérito, se han convertido en académicas—*Southard & Co.* v. *Salinger*, 117 F.2d 194—ya que el entredicho expiró, de acuerdo con la Regla 65(*b*) de las de Enjuiciamiento Civil, a los diez días de expedido. Además, la demandada no tomó acción alguna, a su debido tiempo, para modificar la actuación de la corte a quo en relación con la orden de entredicho, la cual por sus propios términos expiraba el 3 de enero de 1949 y luego fué prorrogada hasta el 7 de enero de 1949, fecha en que se celebró el juicio y al terminar éste, se prorrogó de nuevo hasta el 20 de enero. Eso no obstante, no fué hasta el 27 de junio de 1949 que se expidió el injunction preliminar, sin que de los autos aparezca que se prorrogara adicionalmente en forma alguna el entredicho. Pasemos a considerar el tercer error señalado.

■ La concesión del injunction solicitado está basada, principalmente, en que la actuación de la apelante al vender en Puerto Rico una partida de brandy Domecq que compró en Nueva York, a un precio inferior al fijado por la firma Pedro Domecq S. A. de España para dicho producto en Puerto Rico, a base del contrato celebrado con su agente Benigno Trigo Orbeta, constituye una violación a la Ley de Comercio Leal de Puerto Rico (*Fair Trade Act*), o sea la Ley núm. 147 de 15 de mayo de 1937 ((1) pág. 391), según enmendada por la Ley núm. 265 de 15 ,de mayo de 1938

[1] Al radicarse la petición la corte expidió un entredicho, previa prestación de una fianza.

((1) pág. 512) (²)   Al efecto, entre sus conclusiones de hechos, la corte inferior hizo constar la siguiente:

"Que el contrato existente entre don Benigno Trigo Orbeta y la Sociedad Pedro Domecq S. A. (*exhibit* I de los demandantes) concede al primero 'en virtud de la exclusiva que se le concede y para hacer frente a los compromisos y obligaciones que se mencionan en este contrato, el agente fijará los precios de venta para los importadores según la nota número 2 también adjunta a este contrato, entendiéndose igualmente estos precios F. O! B. Cádiz y sin descuento ni comisión; en el caso de que la casa aumente o disminuya sus precios el agente estará obligado a aumentar o disminuir los suyos en la misma proporción'."

Sostiene la apelante que esta conclusión es errónea, ya que el contrato mencionado fué enmendado en la misma

(²) Por ser relativamente corta transcribimos el texto de dicha ley a continuación:

"Sección 1.—Esta Ley se conocerá con el nombre de 'Ley de Comercio Leal' (*Fair Trade Act*).

"Sección 2.— (Según enmendada por la Ley núm. 265 de 1938).—Los contratos relacionados con la venta o reventa de cualquier producto, objeto de comercio en Puerto Rico, cuya etiqueta o envase muestre la marca de fábrica (*trade mark*), tipo de calidad o nombre del productor o dueño de artículo y el cual estuviere. en competencia con artículos de clase similar producidos por otros, podrán contener las siguientes estipulaciones:

"1. Que el comprador no revenderá tal producto excepto al precio mínimum estipulado por el vendedor;

"2. Que el productor o vendedor original queda obligado a exigir, al efectuar cualquier transacción con otro comprador en relación con dicho artículo, que éste, a su vez, se obligue a no vender el mismo artículo a menor precio que el estipulado por el productor o vendedor original;

"3. Que cuando el comprador se viere precisado a liquidar sus mercaderías, deberá ofrecer los artículos objeto de liquidación a otros comerciantes dedicados al mismo ramo, por lo menos con diez (10) días de anticipación al fijado para verificar dicha liquidación; y

"4. Que el Comisionado de Agricultura y Comercio tendrá facultades amplias para arbitrar cualquier controversia que surgiese por. razón de lo establecido en esta Ley, y si las partes en controversia no se mostraren conformes en someter sus diferencias al Comisionado de Agricultura y Comercio, éste, a petición de cualquiera de ellas, tendrá facultad para determinar la acción que fuere de aplicación, de acuerdo con las circunstancias especiales del caso.

"No surtirán efecto las anteriores estipulaciones en los siguientes casos:

"(*a*) Cuando por tenerse necesidad de descontinuar su negocio, el

fecha de su otorgamiento eliminándose del mismo precisamente lo que entre comillas aparece en dicha conclusión. Tiene razón la apelante como veremos en seguida.

El contrato de referencia (exhibit I de los peticionarios) fué otorgado el 14 de enero de 1948 y dice así:

"LA CASA PEDRO DOMECQ S. A., de Jerez de la Frontera y el SR. BENIGNO TRIGO de San Juan, P. R., en el día de la fecha acuerdan y convienen lo que sigue:

"PRIMERO: La casa Pedro Domecq S. A. concede a Benigno Trigo la franquicia exclusiva para la venta de sus productos en todo el territorio de la isla de Puerto Rico e Islas Vírgenes, con el título de AGENTE CONCESIONARIO EXCLUSIVO.

"SEGUNDO: El Agente se compromete por su parte a no representar ni vender ningún producto similar a los de la Casa.

---

comerciante o distribuidor se vea obligado a liquidar sus mercaderías, siempre que con treinta (30) días de anticipación a dicha liquidación ofrezca los productos sujetos a liquidación a los fabricantes de los mismos.

"(b) Cuando los artículos estén dañados, deteriorados o defectuosos, en cuanto a calidad, debiéndose en este caso publicar un aviso en el cual se expresen las condiciones de los artículos así dañados, deteriorados o defectuosos, y cuyo aviso deberá publicarse tres veces en el término de diez (10) días, en uno de los periódicos de mayor circulación en la Isla de Puerto Rico.

"(c) Cuando así se disponga por sentencia, decreto, u orden de un tribunal de jurisdicción competente.

"Sección 3.—Toda persona o firma que a sabiendas y de una manera maliciosa, anuncie u ofrezca para la venta, o venda cualquier artículo de comercio a un precio más bajo de lo estipulado en un contrato otorgado de acuerdo con las disposiciones de la sección segunda precedente, aunque la persona que así anuncie, ofrezca o venda, sea o no una parte interesada en dicho contrato, se considerará que está incurriendo en una competencia desleal (unfair competition), y será responsable de una acción por daños y perjuicios, y si el caso se resolviese a favor del reclamante, la corte determinará el importe de la indemnización que le corresponda.

"Sección 4.—Esta Ley no será aplicable a ningún contrato o convenio efectuado por productores entre sí, o por vendedores al por mayor entre sí, o entre detallistas entre sí, en cuanto se refiere a los precios de reventa.

"Sección 5.—Si cualquier cláusula, párrafo, artículo, sección o parte de esta Ley fuere declarada anticonstitucional por un tribunal de jurisdicción competente, dicho fallo no afectará o invalidará las otras disposiciones de esta Ley, sino que su efecto quedará limitado a la cláusula, párrafo, artículo, sección o parte de esta Ley que así fuere declarada."

y a procurar con toda actividad el desarrollo y fomento de la venta de los mencionados Productos en su territorio.

"TERCERO: El Agente venderá exclusivamente al Comercio Mayorista Importador y para la importación directa consignada al comprador.

"CUARTO: *Los precios de los Productos de la Casa serán los que se detallan en la Nota núm. 1* adjunta a este Contrato, o los que en lo sucesivo cotice la Casa, entendiéndose estos precios F. O. B. Cádiz, sin descuento ni bonificación de ninguna clase.

"QUINTO: *En virtud de la exclusiva que se le concede y* para hacer frente a los compromisos y obligaciones que se mencionan en este Contrato, *el Agente fijará los precios de venta para los importadores según la Nota núm. 2 también adjunta a este Contrato, entendiéndose igualmente estos precios F. O. B. Cádiz y sin descuento ni comisión. En el caso de que la Casa aumente o disminuya sus precios el Agente estará obligado a aumentar o disminuir los suyos en la misma proporción.*

"SEXTO: Los Contratos de venta celebrados entre el Agente y el Importador serán enviados a la Casa para su cumplimiento entendiéndose que estarán siempre sujetos a la aceptación definitiva de ésta.

"SÉPTIMO: *La única forma de pago que podrá aceptar el Agente* en el contrato de venta es la de Crédito irrevocable a favor de la Casa en Banco Español por el valor del pedido *a los precios establecidos por la Casa con un aumento prudencial para cubrir los gastos consulares y de todas clases que se originen en el embarque.* Este crédito será cobrable contra entrega de los documentos de embarque. La Casa extenderá las facturas a nombre del Importador y por un valor principal calculado a los precios que fija el contrato de venta.

"OCTAVO: En consideración de la franquicia exclusiva que la Casa le concede al Agente, éste se compromete a efectuar por su cuenta toda la publicidad, propaganda y anuncio necesarios para el adecuado desarrollo y fomento de las ventas; el pago de los salarios o comisiones de subagentes y vendedores; y todos aquellos cargos que pudieran originarse procedentes de reclamaciones, averías y otros imprevistos y que en ausencia de este Contrato habría de pagar la Casa para la protección de su negocio y buen nombre.

"NOVENO: La duración de este Contrato es de tres años a partir de la fecha de su firma y a su expiración se considerará

prorrogado por igual plazo de no existir aviso en contrario por cualquiera de las partes con seis meses de anterioridad a la fecha de su expiración.

"DÉCIMO: Este Contrato se elevará a escritura pública cuando así lo requiera cualquiera de las dos partes contratantes.

"UNDÉCIMO: Este Contrato anula todos los Contratos y Convenios anteriores." (Bastardillas nuestras.)

El mismo día 14 de enero de 1948 se modificó dicho contrato (anexo del exhibit I de los peticionarios) en la siguiente forma:

"De acuerdo con nuestras conversaciones *venimos en modificar el Contrato vigente* entre nosotros en la forma que a continuación se detalla:

"CUARTO: Los precios de los productos de la Casa serán los que se detallan en nota adjunta a esta carta, o los que en lo sucesivo cotice la Casa, entendiéndose estos precios F. O. B. Cádiz y netos sin descuento.

"QUINTO: *Como remuneración de sus servicios el Agente percibirá un 7½% sobre el valor principal de las facturas sobre todas las ventas celebradas en su territorio y que tengan buen fin.*

"SÉPTIMO: La forma de pago será por crédito irrevocable por el 80% del valor de la factura más todos los gastos consulares y de todas clases que en ella figuren. El Agente se hace responsable del cobro del 20% restante del cual aplicará lo que corresponda a su comisión y a los gastos de propaganda de que habla la cláusula Octava, reteniendo el resto a disposición de la Casa.

"OCTAVO: El Agente queda autorizado a invertir en propaganda y anuncio de los productos de la Casa un 5% del valor principal de las facturas producidas, debiendo dar cuenta de estas inversiones cuando la Casa así lo solicite. El Agente por su parte se compromete a invertir por su cuenta en anuncio y propaganda de las marcas de la Casa, una cantidad igual a la que la Casa le conceda, de cuya inversión también dará cuenta.

"DÉCIMO: Esta cláusula queda anulada.

"Las cláusulas no mencionadas en esta carta quedan en todo su vigor." (Bastardillas nuestras.)

Como puede verse, los términos del contrato, tal y como quedó enmendado, son muy distintos a los del contrato original, especialmente en sus cláusulas quinta y séptima. Mientras en el primero, después de fijarle el precio a que la Casa Domecq le vendía sus productos al agente, según Nota núm. 1 (cláusula cuarta), se autorizaba por la cláusula quinta al agente Benigno Trigo Orbeta a fijar los precios de venta para los importadores según Nota núm. 2; y por la cláusula séptima se establecía la forma de pago "a los precios establecidos por la Casa", al ser enmendado el contrato, la cláusula quinta en forma alguna autorizó al agente Benigno Trigo Orbeta a fijar precios para la reventa en Puerto Rico. Tampoco contiene dicho contrato estipulación alguna al efecto de que el comprador, Trigo Hermanos, Inc., no revendería los productos Domecq excepto al precio estipulado por el vendedor, ni que el productor o vendedor original, la Casa Domecq, quede obligada a exigir, al efectuar cualquier transacción con otro comprador, bien fuera Trigo Hermanos, Inc. u otro mayorista en relación con dichos artículos, que éstos a su vez se obligaran a no venderlos a menor precio que el estipulado por el productor o vendedor original, según exigen los apartados 1 y 2 de la sección 2 de la Ley de Comercio Leal, supra. Bajo todas estas circunstancias, el contrato entre la Casa Domecq y Benigno Trigo Orbeta no puede conceptuarse como uno que caiga bajo, y esté protegido por, las disposiciones de la mencionada ley. El hecho de que Benigno Trigo Orbeta declarara que él fijaba los precios a que Trigo Hermanos, Inc. como distribuidores mayoristas podían revender, tampoco tenía el efecto de que dichos precios fueran los estipulados por el vendedor original. Y desde luego, nada hay en el contrato que tienda siquiera a fijar los precios a que los productos Domecq debían ser vendidos por los detallistas.

Leyes de Comercio Leal (*Fair Trade Acts*) han sido aprobadas en por lo menos cuarenta y cuatro de los Estados

Continentales(³) y la nuestra, en términos generales, es similar a la de los estados de California e Illinois. Estas leyes constituyen una excepción a las leyes prohibiendo los monopolios y las prácticas monopolísticas,(⁴) y aun en el sistema federal, la Ley Miller Tydings de 1937, 15 U.S.C.A. 1, que enmendó la Ley Sherman contra monopolios, eliminó los contratos sobre fijación de precios de artículos con marcas de fábrica (*trade marks*) de las prohibiciones de la Ley Sherman y declaró que no constituía un método desleal de competencia con artículos de clase similar, siempre que tales contratos sean legales en el sitio donde se haga la reventa. Antes de aprobarse la Ley Miller Tydings, la Corte Suprema de los Estados Unidos en el caso de *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, resolvió que un contrato a virtud del cual el productor o manufacturero fijaba el precio a que sus compradores, mayoristas o detallistas, podían vender sus productos, era uno en restricción del comercio (*restraint of trade*) e inválido bajo la ley común y en tanto afectaba el comercio interestatal también bajo la Ley Sherman. En este caso hubo una vigorosa opinión disidente del Juez Holmes(⁵) en la cual hizo constar que siendo la base principal de la conclusión de la mayoría la ausencia de una ley que autorizara la fijación de precios en estos casos, dijo:

"Pero voy más lejos. No hay estatuto que cubra el caso; no hay precedentes que por lógica ineluctable requieran la conclusión a que ha llegado la corte. Se llega a dicha conclusión extendiendo cierto concepto de política pública a una esfera nueva. En tales materias estamos en terreno peligroso. Creo

(³) Así se hace constar en las Monografías sobre estas leyes contenidas en 125 A.L.R. 1335 y en 86 L.ed. 1421.

(⁴) Ley para proteger el comercio contra coacciones y monopolios de marzo 14 de 1907. Comp. Est. Rev. 1941, pág. 1389.

(⁵) Al comentar dicha opinión Sir Frederick Pollock en carta de mayo 3 de 1911 dirigida al Juez Holmes, decía en parte: "O bien su opinión disidente en el caso de *Miles Medical Co.* es correcta o gran parte de nuestras autoridades aquí están equivocadas. . . ." 1 Holmes-Pollock Letters 178.

que, por lo menos, no hay peligro en decir que la más esclarecida política judicial es dejar que las personas manejen sus propios negocios a su manera, a menos que el motivo para intervenir sea bien claro. . . ."

Tan pronto el Tribunal Supremo Nacional tuvo ante su consideración un caso en el cual tenía que interpretar una ley de Comercio Leal, varió el criterio expresado en el de *Dr. Miles Medical Co.* Fué en el de *Old Dearborn Co.* v. *Seagram Corp.*, 299 U.S. 183, en el cual, interpretando la Ley de Comercio Leal de Illinois y después de citar del caso de *Dr. Miles Medical Co.* las referencias que en él se hacían a la ausencia de legislación, se dijo a la pág. 191: "Aun cuando estas observaciones de la corte no pueden, desde luego, considerarse como decisivas de la cuestión, ellas implican claramente que la corte en aquel momento no previó ninguna objeción constitucional válida a tal legislación, pues no puede suponerse que la corte sugiriera un remedio legislativo la validez del cual pudiera estar sujeta a duda." Procedió entonces la corte a considerar el caso bajo la Ley de Comercio Leal de Illinois y resolvió que la misma era válida, ratificando así innumerables decisiones estatales que ya habían sostenido la validez de estas leyes.[6] Empero, constituyendo esta legislación y los contratos por ella autorizados, una excepción a las leyes sobre monopolios y prácticas desleales de comercio, sus disposiciones deben ser interpretadas restrictivamente. *Mennen Co.* v. *Krauss Co.*, 37 F.Supp. 161 (D.C. La., 1941) ; *Bathasweet Corporation* v. *Weissbard*, 15 A.2d 337 (N.J., 1940) ; *Pazen* v. *Silver Rod Stores*, 22 A.2d 237 (N.J., 1941) ; *Rayess* v. *Lane Drug*

---

[6] Véanse las Monografías citadas en la nota 3. La constitucionalidad de la Ley Miller Tydings fué sostenida, por mayoría, en el caso de *Schwegmann Brothers* v. *Calvert Distillers Corp.*, 184 F.2d 11 (C.A. 5, 1950). La Corte Suprema concedió certiorari en dicho caso y el mismo fué argumentado ante dicho tribunal la semana pasada. 19 *Law Weekly* 3275. Se ataca la validez de la ley federal en tanto en cuanto pueda hacer aplicable la Ley de Comercio Leal a personas que no han intervenido en el otorgamiento de los contratos autorizados bajo esta última.

*Co.*, 35 N.E.2d 447 (Ohio, 1941) y 52 Am.Jur. 650, sec. 180. Pero, desde luego, la interpretación judicial no debe ser tan estricta que destruya el propósito de la ley. *Calvert Distilling Corp.* v. *Nussbaum Liquor Store*, 2 N.Y.S.2d 320 (N.Y., 1938).

". . . El propósito primordial de esta legislación es la protección de la propiedad—es decir, el buen nombre (*good will*)—del productor, que aún le pertenece. . . ." *Old Dearborn Co.* v. *Seagram Corp.*, supra, pág. 193. Y en efecto, la fijación de precios de venta y reventa del producto en forma vertical, a saber, del productor al distribuidor al detallista, es requisito esencial del contrato, ya que la misma ley, en su sección 4, supra, prohibe cualquier contrato o convenio efectuado en forma horizontal, es decir, por productores entre sí, por vendedores al por mayor entre sí o entre detallistas entre sí. Como hemos dicho, la prueba en este caso demostró que si bien la Casa Domecq fijó a sus productos los precios a que su agente Benigno Trigo Orbeta podía venderlos a los mayoristas importadores y para la importación directa consignada al comprador, en forma alguna se fijó el precio a que dichos mayoristas debían revenderlos ni tampoco el precio a que, en última instancia, serían vendidos al detall. No existió una verdadera fijación de precios en forma vertical según lo requieren la ley y la jurisprudencia. *Joseph Triner Corporation* v. *McNeil*, 2 N.E.2d 929, confirmado en 299 U.S. 183; *Ely Lilly & Co.* v. *Saunders*, 4 S.E.2d 528 (N.C., 1939); Anotación, 125 A.L.R. 1335 *et seq.* En otras palabras, el contrato de autos fija el precio a que los mayoristas pueden *comprar* a la Casa Domecq pero en forma alguna se fija un precio de reventa y esto último, precisamente, es lo que la Ley de Comercio Leal trata de proteger, es decir, el precio de reventa de aquellos artículos que tienen marcas de fábrica reconocidas en competencia con otros artículos similares. Ha sido la marca de fábrica, el buen nombre (*good will*) que ella representa, lo que las leyes de Comercio Leal han querido proteger y no

el producto mismo, llegándose a decir en *Old Dearborn Co. v. Seagram Corp.*, supra, pág. 195, que nada hay en la ley que prohiba al comprador remover la etiqueta contentiva de la marca de fábrica, "separando así la propiedad física que le pertenece, del buen nombre (*good will*) que es propiedad de otro—y entonces vender el producto al precio que desee, siempre que pueda hacerlo sin utilizar el buen nombre (*good will*) del último como una ayuda a tal fin".

Erró, a nuestro juicio, la corte inferior al expedir el auto de injunction preliminar a base de que la apelante había violado las disposiciones de la Ley de Comercio Leal.

El segundo fundamento que tuvo la corte para expedir dicho auto fué que la apelante estaba utilizando en la venta de los productos Domecq una etiqueta distinta a la autorizada por el productor para la venta de dichos productos en Puerto Rico.

La corte a quo hizo constar que la venta en Puerto Rico por la apelante de ciertas partidas de brandy Domecq adquiridas por ella de la distribuidora de dicho producto en Nueva York, con una etiqueta distinta a la autorizada por Pedro Domecq S. A. para el territorio de Puerto Rico, a precios distintos a los fijados, constituye un acto de competencia desleal prohibido por la sección 3 de la Ley de Comercio Leal, supra. Eliminando la cuestión de los precios, nada hay en la sección 3 que disponga que el vender un artículo de comercio con una etiqueta distinta, pero legítima,(7) que muestre una marca de fábrica determinada, constituye una competencia desleal. Dicha sección lo que prohibe es la venta a un precio más bajo de lo estipulado en un contrato otorgado de acuerdo con la sección segunda.

Esto no obstante, el injunction es el remedio adecuado, si los hechos lo justifican, para proteger el derecho de pro-

---

(7) Es un hecho admitido que la etiqueta usada en los productos Domecq vendidos en Nueva York es la autorizada por el productor y que el contenido de las botellas así rotuladas es brandy Domecq legítimo.

piedad sobre una marca de fábrica registrada,([8]) cuando alguna persona usurpa o infringe dicha marca de fábrica utilizando una similar en otro producto distinto y estableciendo así una competencia desleal—*Sucrs. de J. Fernández v. Domenech, Tes.*, 60 D.R.R. 906—pero hemos resuelto que una sociedad que solamente es agente general del fabricante de un producto, dueño de la marca de fábrica, para la introducción y venta de dicho producto en Puerto Rico no tiene derecho al remedio de injunction para impedir el uso de dicha marca. *Sucrs. de Font & Cía.* v. *López Hermanos*, 36 D.P.R. 261.

Tenemos ante nos las botellas de brandy Domecq ofrecidas y admitidas como prueba en este caso y en verdad, la etiqueta grande pegada a la botella de brandy Domecq distribuído por Trigo Hermanos, Inc. en Puerto Rico, según se hace constar en una etiqueta pequeña adherida al cuello de la botella, y la etiqueta grande de la botella de brandy Domecq comprada por la apelante al distribuidor de dicho producto en Nueva York son, si no iguales, tan similares que no puede decirse que una persona de ordinaria inteligencia pueda ser inducida a engaño al comprar una u otra botella de dicho licor. *Cf. Fonalledas* v. *Las Monjas Dairy Corp.*, 63 D.P.R. 87. Admitida la legitimidad del brandy Domecq que una y otra botella contuviera, no podemos convenir con la corte inferior en que las etiquetas de dichas botellas sean en tal forma distintas que la venta en Puerto Rico del brandy Domecq comprado en Nueva York pueda causarles perjui-

---

([5]) La prueba demostró que la etiqueta conteniendo la marca de fábrica del brandy Domecq vendido en Puerto Rico está debidamente registrada y aprobada por la Administración Federal de Alcohol, por el Negociado de Bebidas Alcohólicas del Departamento de Hacienda de Puerto Rico y por el Negociado de Aduanas Federal, haciéndose constar por este último que el dueño de la marca de fábrica Pedro Domecq S. A. de Jerez de la Frontera, España, ha consentido en que Trigo Hermanos, Inc. importe los productos que contengan su marca de fábrica. No se probó que dicha marca de fábrica estuviera registrada en la Secretaría Ejecutiva de Puerto Rico bajo la Ley núm. 66 de 28 de julio de 1923 para autorizar el registro de marcas de fábrica usadas en el comercio de Puerto Rico y proteger las mismas.

cios a los apelados por establecer una competencia desleal con el brandy Domecq vendido por ellos en Puerto Rico. Ambas etiquetas están redactadas en el idioma inglés y la diferencia principal que existe entre una y otra es que en la de Nueva York, en su margen superior, al centro, dice: "Pedro Domecq" y a ambos lados de dicho nombre tiene unas notas musicales y debajo dice: "In Tune with your Taste", inscripción que no tiene la etiqueta del brandy distribuído por los apelados. En su lugar, ésta tiene una inscripción que dice: "It has always been the policy of Pedro Domecq's firm since its establishment in 1730 to maintain their quality at the highest standard". Por lo demás, ambas etiquetas contienen sustancialmente las mismas inscripciones, diseños y un escudo, en alto relieve, suponemos que de la Casa Domecq.

Es en el cuello y sobre el tapón de la botella del brandy Domecq comprado por la apelante en Nueva York que en la estampilla de Rentas Internas insular se ha hecho constar, por medio de un sello de goma: "Sobrino de Izquierdo, Inc., Agentes Generales, San Juan, P. R.", y es principalmente este hecho adicional el que señalan los apelados como constitutivo de un engaño perjudicial a sus intereses y de una competencia desleal. No tenemos duda de que esta actuación de la apelante sería suficiente para decretar el injunction solicitado en este caso. *Joseph S. Baum Mercantile Co.* v. *Levin,* 174 S.W. 442 (Mo., 1915); *Twin City Brief Printing Co.* v. *Review Pub. Co.,* 166 N.W. 413 (Minn., 1918); *Cf. Sucn. González* v. *Roque González & Cía.,* 33 D.P.R. 569. Empero, de acuerdo con la declaración del testigo de la apelante Enrique Trigo de Orbeta,(⁹) no contradicha por los apelados, se demostró que inmediatamente después de celebrada la conferencia anterior al juicio en este caso, se procedió por la apelante a eliminar de las estampillas de Rentas Internas de todas las botellas de brandy compradas por ella, la inscripción contenida en el sello

---

(⁹) Transcripción de Evidencia, págs. 165–166.

de goma al efecto de que Sobrino de Izquierdo, Inc. son Agentes Generales de los productos Domecq en Puerto Rico. La regla general es al efecto de que un injunction debe concederse o denegarse a base de los hechos y circunstancias existentes a la fecha de la vista del recurso. *Las Monjas Racing Corp.* v. *Comisión Hípica*, 57 D.P.R. 522; *United Brotherhood, etc.* v. *United Slate Tile, etc.*, 29 A.2d 839 (C.A. Md!., 1943); *Rosenthal* v. *Shepard Broadcasting Service*, 12 N.E. 2d. 819 (Mass., 1938); *American Fruit Growers* v. *Parker*, 140 P.2d 23 (Cal., 1943); *Levine* v. *Black*, 44 N.E.2d 774 (Mass., 1942) y *cf. Reyes* v. *Las Monjas Racing Corp'n.*, 40 D.P.R. 910.

Tenemos, por lo tanto, que si las etiquetas del brandy Domecq usadas por el productor, tanto para los licores distribuídos en Nueva York como para los distribuídos en Puerto Rico, no puede decirse que sean esencialmente distintas en tal forma que la venta de los primeros en Puerto Rico por la apelante pueda constituir una competencia desleal con los vendidos por los apelados, y habiéndose probado que la apelante no pretende hacerse pasar como agente general de la Casa Domecq en Puerto Rico, en perjuicio de los apelados, tampoco debió concederse el injunction preliminar en este caso por dichos motivos.

*Debe revocarse la resolución apelada.*

El Juez Asociado Sr. Snyder concurre con el resultado de la opinión.