COOPERATIVA DE CAFETEROS DE PUERTO RICO, demandante y recurrente, *v.* F. COLÓN COLÓN, demandado y recurrido.

*Número:* R-62-92          *Resuelto:* 17 de noviembre de 1964

*Héctor González Blanes,* abogado de la recurrente; *Abelardo Román Font,* abogado del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Las siguientes son las cuestiones que debemos considerar en este caso:

(1) Si es o no es válida y efectiva la marca registrada "Café Rico".

(2) De no serlo, si adquirió o no una significación secundaria que justifica que se proteja en contra de su infracción por el recurrido, F. Colón Colón, competidor de la recurrente, Cooperativa de Cafeteros de Puerto Rico, en la distribución y venta de café tostado y molido en el mercado del país.

(3) Si la referida marca en efecto adquirió tal significación, debemos determinar si el rótulo que usa el recurrido en su bolsa de café es tan similar al que usa la recurrente en la suya que de hecho causa confusión en el mercado y al público consumidor o existe la posibilidad razonable de que la cause.

(4) De haberse causado tal confusión, si la actuación del demandado constituye una competencia desleal en perjuicio de la recurrente que justifica su restricción y la concesión de los daños y perjuicios que la recurrente hubiere sufrido.

La recurrente solicita que se restrinja al recurrido y a otros de continuar empacando y comerciando con las bolsas o envase que utilizan similares a los de la recurrente en su negocio de venta de café o de continuar vendiendo café en tales envases o bolsas por el hecho de que en éstos se ha insertado con particular despliegue y ostentación la palabra "Rico" utilizando un diseño y combinación de colores—rojo y negro—sustancialmente iguales a los correspondientes a la marca de fábrica y nombre comercial (*trade name*) de la

recurrente que ésta ha venido usando por años y la cual ha pasado a ser conocida del público consumidor e identificada con el producto que la recurrente produce, de manera que la presentación o exhibición de dichos envases o bolsas causa confusión en el mercado y al público consumidor en general por el obvio parecido con las bolsas en que vende su café la recurrente. Alega que en esta forma el recurrido se aprovecha y se enriquece injustamente del crédito y de la plusvalía de que goza el café de la recurrente, induciendo al público mediante una competencia desleal, a comprar su producto en la equivocada creencia de que el mismo es el producto de la demandante, así como perturbando y creando inconvenientes peligrosos para la recurrente en el desenvolvimiento de su negocio. Por último, alega la recurrente que con tal motivo ha sufrido daños ascendentes a $100,000, el pago de los cuales solicita.

El recurrido negó específicamente los hechos esenciales de la referida demanda y como defensas especiales alegó, en síntesis, que el registro de la marca "Rico" era ilegal por ser éste de carácter descriptivo; que la combinación de colores rojo y negro no formaba ni podía formar parte de dicha marca por ser un elemento de mera función decorativa y ha sido usada por el recurrido con anterioridad a la recurrente y luego por toda la industria de torrefacción de café; que la expresión "Puro de Puerto Rico" que usa e invoca la recurrente como parte de su marca no fue incluida en el registro de la misma y la ha usado desde hace sólo poco tiempo y no puede apropiarse para uso exclusivo; que el uso por la recurrente de las marcas "Rico" para su café tostado y molido y "Puerto Rico" para su café crudo y la campaña de anuncios de la recurrente en publicaciones, radio, y televisión usando dichas marcas y diseño en un contexto que da ilegalmente a la marca "Rico" un sentido geográfico, da a entender falsa y maliciosamente al público consumidor que el café producido y empacado por la recurrente es el único café puro de Puerto

Rico que hay en el mercado, lo cual es falso; y tiende así a monopolizar el uso de la palabra "Rico" y la industria de torrefacción de café puro de Puerto Rico en perjuicio y daño de los demás productores y en particular del recurrido; que como consecuencia de esto descendieron las ventas de café del recurrido durante los años 1957–1958 que ha venido realizando por 16 años en envases usando en éstos una combinación de colores, apariencia general y colorido del envase de que se queja la recurrente, además de la marca "Flor de Borinquen"; que para afrontar dicha competencia en 1958 modificó el recurrido la rotulación de su envase sólo para hacer resaltar la expresión "Café de Puerto Rico" haciendo resaltar en forma de fácil percepción que es el recurrido el productor de dicho café, y el sitio donde se produce; que luego de iniciada esta acción la recurrente ha hecho un cambio en la apariencia general de su envase eliminando una diferencia notable que existía entre los envases de los litigantes aumentando así cualquier posibilidad que existiera de que se confundieran ambos envases; que de acuerdo con lo previamente expuesto la recurrente no ha actuado de buena fe y con conciencia limpia (*clean hands*); que el recurrido no ha tenido la intención de pasar su producto por el de la recurrente y para hacer más notable la diferencia entre ambos envases, aquél ha ordenado que en sus nuevos envases se use el término "Puerto" en lugar de la abreviatura "Pto" y que su marca "Flor de Borinquen" se consigne en título mayor y el nombre del recurrido más claro y perceptible aún. Por vía de reconvención, solicita el recurrido que se restrinja a la recurrente de continuar realizando los actos y causarle los perjuicios alegados, inclusive los sufridos con motivo y mientras estuvo en efecto un interdicto provisional contra el recurrido solicitado por la recurrente; que se declare nula e inválida y se cancele la inscripción de la marca "Rico"; y que se le condene al pago de $100,000 en que estima el recurrido los daños que ha sufrido. La recurrente negó los hechos alegados en la

referida reconvención.

Luego de numerosos incidentes y un largo juicio en que las partes presentaron extensa prueba documental y oral, el tribunal de instancia en definitiva declaró sin lugar la demanda en este caso y declaró al demandado por desistido de su reconvención con perjuicio en cuanto al *injunction* y la orden de cancelación del registro y de la marca, y sin perjuicio en cuanto a los daños alegados, a través de un extenso y laborioso dictamen en el cual hizo las siguientes determinaciones de hecho principales:

(1) Que la recurrente adquirió por compra y utilizaba la marca "Rico" el registro de la cual expiró en 1944 sin que fuera renovado.

(2) Que en 1948 la recurrente registró la marca "Rico" con un diseño especial de dicha palabra, registro que aún está en vigor y ésa es la marca a que se refiere la recurrente.

(3) Que los avisos al público para el registro de dicha marca y su renovación se hicieron en tinta negra en papel blanco sin hacer referencia al color o combinación de colores del envase pero en la petición de registro la recurrente radicó un facsímil del diseño especial en tinta negra sobre papel rojo no apareciendo ni en los anuncios ni en los facsímiles del rótulo de la referida marca registrada la expresión "Puro de Puerto Rico", expresión que la recurrida reclama como su supuesto lema o nombre comercial ni se probó desde cuándo usa la recurrente en dichos envases la expresión "Puro de Puerto Rico" a que antes ha hecho referencia; que la palabra "Café Rico" en fondo blanco en las tapas de las bolsas de la recurrente y las frases en los lados estrechos de dicha bolsa son características del envase que no figuraron ni en la referida solicitud de registro de marca ni en los mencionados avisos al público.

(4) Que el recurrido ha usado desde 1945 envases o bolsas en color rojo y las marcas "Flor de Borinquen" y "Dilari" que no han sido registradas; que ha usado la combinación

de colores de que se queja la recurrente desde 1946 excepto que la expresión "Puro de Puerto Rico" *fue destacada como factor dominante o elemento principal en un diseño distinto de letras y el tipo de la marca "Flor de Borinquen" fue reducida en tamaño.*

(5) Que desde 1954 hasta 1958 el recurrido sufrió una merma en sus ventas debido a que, por haber usado y vendido anteriormente café del país mezclado con extranjero, mezcla que el consumidor local repudia, éste se acostumbró a pensar que el producto del recurrido continuaba siendo de dicha mezcla y, además, debido a que la recurrente usa en sus anuncios la expresión "Café Rico" en texto que sugiere y da al público la impresión de que el suyo es el único café puro de Puerto Rico; que bajo esta impresión el recurrido consideró necesario variar, y en 1958 varió, el diseño de la rotulación de sus envases de café, consignando en primer término en la parte superior de los envases y en tipo grande y forma conspicua, la expresión "Puro de Pto. Rico", que antes usaba menos ostensiblemente y sin abreviar la palabra "Puerto"; que el tipo, estilo y diseño de las letras de esta expresión "Puro de Pto. Rico", así como el de la palabra "Rico" que como parte del nombre geográfico "Puerto Rico" contiene *son diferentes y claramente distinguibles* del tipo y diseño de la palabra "Rico" en la marca de fábrica y en los envases de la recurrente de modo que cualquier comprador común y corriente que use prudencia y cuidado normal puede distinguir fácilmente uno del otro.

(6) Que el recurrido no usa la palabra "Rico" ni la expresión "Puro de Puerto Rico" como marca de fábrica para identificar su producto sino como parte del nombre geográfico de Puerto Rico en la referida expresión "Café Puro de Pto. Rico", como una indicación ostensiva al público de que su producto está preparado con café puro del país, usando debajo de dicha expresión, en *tipo pequeño,* pero claro y fácil de leer y de distinguir la expresión "Marca Flor de Borin-

quen" y debajo "Tostado y Molido por F. Colón Colón" en tipo mayor, seguido de su dirección en Arecibo.

(7) Que el vocablo "Rico" cuando se aplica a café tostado y molido así como a cualquier bebida o alimento, significa que el mismo es de reconocida bondad, gusto, sabroso, agradable, muy bueno, por lo que la palabra es descriptiva y además parte del acervo común de la lengua española y de dominio público.

(8) Que la combinación de colores rojo y negro como la usada en sus bolsas por las partes y la calidad, forma, tamaño y capacidad de tales envases han sido de uso general por los productores de café tostado y molido en Puerto Rico durante muchos años.

(9) Que existe parecido bastante entre el aspecto general y colorido de los envases de los litigantes y *existe la posibilidad de confusión; pero la semejanza no es sustancial y existen diferencias* obvias, como las expresadas previamente en el tipo y diseño de la palabra de que se queja el recurrente y del ancho y separación de las franjas negras.

(10) Que ciertamente, *es costumbre hacer resaltar la marca o nombre de fábrica como elemento dominante del artículo en los envases o rótulos del mismo.* Al hacer en septiembre de 1958 el referido cambio en la rotulación de su paquete, *el recurrido se desvió de esta costumbre, consignando la marca "Flor de Borinquen" en tipo mucho más pequeño, y, como atributo dominante del rótulo, la expresión "Café Puro de Pto. Rico".*

(11) Que del hecho de que en las fotografías admitidas en evidencia aparezcan unas bolsas de café del recurrido en las tablillas que parecen estar destinadas a las de la recurrente no se infiere necesariamente que haya habido error y confusión, pues como en los supermercados los clientes se sirven así mismo puede inferirse que esos bolsos fueron tomados y rechazados por los que los tomaron y devueltos al escaparate sin preocuparles a qué tablilla los devolvían.

(12) No hay evidencia de que la palabra "Rico" ni la especial combinación de colores y presentación del envase de la recurrente hubiera adquirido sentido secundario antes de que el demandado empezara a usar la combinación de colores y presentación similar de que se queja la demandante ni que la haya adquirido nunca pues el mero hecho continuado por un largo período de años aunque es un elemento de prueba de sentido secundario no puede por sí solo probar y no ha habido ningún otro elemento de prueba para establecerlo; que el uso del colorido, la combinación de colores y presentación general del envase de la recurrente no ha sido exclusivo, pues lo ha usado también el recurrido durante más de 14 años sin protesta de la recurrente.

(13) Que la práctica de la recurrente de anunciar "Café de Puerto Rico" conjuntamente con "Café Puerto Rico" sin especificar que la primera marca es para identificar café crudo solamente y la última para café tostado y molido y la práctica de usar la palabra "Rico", la expresión "Rico" con múltiples diseños y también la expresión "Cafe Rico" tiende a monopolizar el uso del vocablo "Rico" en el tráfico del café y conjuntamente esa práctica y el término "Café Rico" y "Cafe Puro de Puerto Rico" que usa la recurrente en los anuncios que publica en la prensa, tienden a sugerir erróneamente que su café es el único café puro de Puerto Rico en el mercado del país.

(14) Que la recurrente ha permitido al recurrido el uso de sus envases objetados por más de 13 años sin haber hecho objeción alguna o tratado de impedir su uso.

(15) Que la protesta de la recurrente viene debido a que el recurrido *adoptó el uso conspicuo de la expresión "Café Puro de Puerto Rico" como característica o rango prominente y sobresaliente en su envase.*

(16) Que la evidencia sobre los casos de confusión de los paquetes de los litigantes no ha merecido la confianza y el crédito del tribunal. Si bien existe la posibilidad de confusión

de parte de personas descuidadas y desatentas no puede concluirse que haya probabilidad razonable o sustancial de confusión de parte de personas que usen cuidado ordinario.

(17) Que la sentencia del Tribunal de Distrito de Ponce, hoy Superior, prohibiendo el uso de la marca "Pico" por un productor de Mayagüez de apellido Picó, como marca de fábrica de su café, imitando el diseño especial de las letras de la palabra "Rico" usado como marca de fábrica de la recurrente, estaba justificada porque el uso de "Pico" en lugar de "Picó" hacía casi segura la confusión en el público consumidor, siendo esto un claro uso fraudulento del apellido y del diseño para hacer pasar el producto como el de la recurrente y en tal forma infringió la marca de fábica de ésta.

(18) Que la alegada merma en beneficios montantes a $82,320 de la recurrente es completamente hipotética y especulativa y de existir puede haber sido causada por muchos otros factores.

(19) Igualmente la partida de $21,509 de aumento en gastos adicionales para la venta de café y $46,000 de gastos para activar la propaganda y mitigar los daños son también hipotéticos y fraudulentos y no hay hechos en evidencia que puedan justificar la imputación de la necesidad de los mismos a los actos del recurrido.

Como conclusiones de derecho dictaminó el tribunal:

(1) Que el *injunction* es un remedio en equidad que sólo se concede con gran cautela y en casos extraordinarios en que la necesidad del mismo y las razones para expedirlo son claras; (2) Que la marca "Rico" se registró en violación de la disposición de la Ley de Marcas de Fábrica al efecto de que no se registrará ninguna marca que consista de palabras descriptivas de los artículos que se usen o del carácter o calidad de los mismos. (10 L.P.R.A. sec. 194(e)); en consecuencia el registro es nulo; (3) Que la recurrente no puede procurar protección de su marca al amparo de las Reglas del Derecho Común ya que éstas no rigen en Puerto Rico. *Pueblo*

v. *Tribunal Superior*, 81 D.P.R. 763–770 (1960); especialmente cuando existe una disposición específica de ley contraria a la regla de la Ley Común; (4) Que, sin embargo, cuando una persona ha adoptado y usado durante mucho tiempo una palabra descriptiva para identificar su producto tiene derecho a protección en equidad contra la competencia ilegal o fraudulenta de un productor que la imite con el propósito de pasar su producto por el de aquél o de confundir o engañar al público. A esos efectos es necesario que la marca haya adquirido un significado secundario que en la mente del público signifique exclusivamente el producto de la demandante antes de usarla el demandado y que éste la use o imite para hacer pasar el producto suyo por el artículo de aquél; (5) Que al determinar si hay competencia ilegal los tribunales deben pesar los conflictos de intereses y si es la intención fraudulenta del demandado apoderarse del negocio de la demandante o si éste será necesariamente, o con razonable probabilidad, el resultado de los actos del mismo, y la evidencia de conducta ilegal o deshonesta ha de ser claramente razonable. En este caso el Tribunal entendió que la conducta del recurrido estuvo justificada y no resulta de sus actos que haya tenido la intención fraudulenta en cuestión; que el cambio que hizo en la rotulación de su producto en el 1958 no alteró la apariencia general del paquete que usara en el mercado por muchos años sin protesta de la recurrente y estaba dirigido a hacer constar ante el público conspicuamente que su producto era café puro de Puerto Rico; (6) Que el tribunal a guisa de proteger la marca "Rico" de competencia ilegal no puede incurrir en la paradoja de sostener que la recurrente no puede adquirir el monopolio sobre la palabra o combinación de colores por medio del registro y a la vez conceder ese monopolio amparado en el uso por mucho tiempo; (7) Que no se ha probado el sentido secundario atribuido a la marca "Rico"; (8) Que por la mera posibilidad que existe de que algunas personas

descuidadas y que no ejerciten observación adecuada al hacer sus compras, puedan confundirse, el tribunal no estará justificado para prohibirle al recurrido el uso del envase de que se queja la recurrente. Comparando ambos envases, el tribunal considera que sólo puede confundirse un comprador desatento o descuidado; basta que el productor mantenga una diferencia notable para una persona atenta y cuidadosa y que consigne con razonable claridad y certeza la procedencia del artículo como lo hace el recurrido; (9) Que el caso de *Eneglotaria Medicine Co.* v. *Sosa López*, 38 D.P.R. 604 (1928), es distinguible porque en éste hubo prueba clara de la prioridad en el uso por el demandante y de la existencia de significación secundaria; en el caso ante nos no se ha establecido claramente ni lo uno ni lo otro; además el recurrido no usaba la palabra "Rico" como marca de fábrica distinguiendo su producto haciendo saber al público quién lo fabrica y dónde. Además, el diseño de la palabra "Rico" del recurrido es distinto del de la recurrente; en *Eneglotaria*, supra, las partes estaban en *"pari delicto"* al usar un nombre geográfico mientras que en este caso la recurrente descansa en una palabra descriptiva reclamando el monopolio de la misma, mientras que el recurrido la usa sólo como parte del nombre geográfico del sitio donde se produce el café que utilizara para su producto y no como marca de fábrica; ni mediaron en *Eneglotaria*, supra, las circunstancias del uso de colores en los envases de los litigantes, colores que eran del uso general; en *Eneglotaria*, supra, el tribunal concluyó que el demandado se había propuesto deliberadamente imitar el producto de la demandante y era culpable de competencia ilegal, cosa que no podía inferirse en este caso de los actos del demandado ni de los hechos relacionados con los mismos; ni existió en dicho caso la incuria y la falta de conciencia limpia que el tribunal imputa a la recurrente consistente en (a) que no se quejó del uso por el recurrido de su envase durante 14 años; (b) que el remedio que se solicita es con

el propósito de tener un monopolio; (c) que modificó su envase después de iniciado este pleito aumentando así la probabilidad de error y confusión en el público; y (d) el uso de la marca "Rico" y la marca "Café Puerto Rico" y lo expuesto en varias otras alegaciones en la demanda, todo lo cual convence al tribunal de que la recurrente no ha actuado con conciencia limpia y por lo tanto debe privársele de cualquier derecho que hubiera tenido al recurso de *injunction*. (10) Que no procedía conceder los daños reclamados por la recurrente porque (a) el que hubiera sufrido es *damnum absque injuria;* (b) la recurrente incurrió en incuria al dar ocasión con su pasividad a que el recurrido al hacer el cambio de su rotulación, conservase la presentación de colores y presentación general de su envoltura que venía usando por muchos años; (c) la conducta de la recurrente es demostrativa de falta de conducta limpia; y por último (d) los daños que ha tratado de probar son hipotéticos y especulativos.

La recurrente imputa al tribunal de instancia la comisión de siete errores, a saber:

"(1) al declarar sin lugar la demanda, a pesar de la competencia ilegal que los actos del demandado determinan; (2) al resolver que el registro de la marca "Rico" para el café tostado y molido, que produce y vende la demandante, es nulo; (3) al negar a la demandante la protección del *trade-name* utilizado por ella desde hace más de treinta y seis años; (4) al concluir, contra un hecho físico comprobado—cuales son las bolsas mismas—que la semejanza entre el bolso lanzado al mercado por el demandado y el registrado y usado continuamente por la demandante desde el 1936, *no es sustancial* y que 'existen otras diferencias que son dominantes'; (5) al declarar, *sin prueba alguna que lo justifique* que la demandante ha realizado actos para que su envase—utilizado por ella desde 1936—se parezca más al envase de cuyo uso se querella, y/o que con sus actos ha aumentado la confusión, así como que la demandante ha acudido al tribunal con una 'conciencia impura', siendo 'culpable de incuria durante doce o más años'; (6) al determinar que el demandado

ha sufrido daños reclamables; y (7) al condenar a la demandante al pago de $3,500 por concepto de honoraios de abogado".

Consideraremos el primer error en última instancia, y los otros en el mismo orden en que se han señalado en el párrafo cuarto de la solicitud de revisión de la recurrente.

■ 1.—Convenimos con el tribunal de instancia en que el término "Rico" en la marca de la recurrente es un término descriptivo y en tal virtud la marca cuya protección solicita la recurrente en este caso no era registrable de acuerdo con lo dispuesto en el inciso (e) de la Sec. 4 de la Ley sobre Marcas de Fábrica en vigor (10 L.P.R.A. sec. 194(e)).(¹) Se ha resuelto que los siguientes términos son descriptivos:

(a) *"Nu-Enamel"* en relación con esmaltes que la recurrida produce y vende. *Armstrong Co.* v. *Nu-Enamel Corp.*, 305 U.S. 315, 334 (1938).

(b) *"Lift Truck Parts & Service Inc."* *Lift Truck Parts and Service Inc.* v. *Bourne*, 385 P.2d 735 (Ore. 1963).

(c) *"Dry Fry"* usado en relación con una sustancia para rociar *(spray)* sartenes de manera que se pueda freir sin usar aceite. *E. F. Drew & Co.* v. *Pam Industries, Inc.*, 299 F.2d 777 (7th Cir. 1962).

(d) *"Tub-Kove"*, en relación con una cinta flexible para sellar espacios alrededor de bañeras. *Keller Products* v. *Rubber Linings Corp.*, 213 F.2d 382 (7th Cir. 1954).

(e) *"Silverblu"*, *"Royal Pastel"*, *"Topaze"* y *"Bluefrost"*, en relación con pieles de armiño por ser términos descriptivos de determinadas clases de armiños vivos. *Mid-*

(¹)"No se registrará ninguna marca de fábrica que consista:

"     .     .     .     .     .     .     .

(e) En palabras descriptivas de los artículos en que se usan, o del carácter o calidad de dichos artículos, o simplemente de un nombre o término geográfico". Sec. 4, inciso (e) de la Ley Sobre Marcas de Fábrica. Véase, además, el reciente artículo del Profesor Santa-Pinter, *Registration of Trade Marks in Puerto Rican and Argentine Law*. Rev. Der. Puertorriqueño, Núm. 9, 1963, Universidad Católica de Ponce, págs. 55, 61, 62.

*west Fur Producers Ass'n* v. *Mutation Mink B. Ass'n*, 127 F.Supp. 217 (D.C. Wis. 1954).

(f) *"Nu Grape"*, en relación con una bebida, por estar compuesta por la palabra "new" mal escrita y "grape". *National Nu Grape Co.* v. *Guest*, 164 F.2d 874 (10th Cir. 1947).

(g) *"Raisin Bran"*, en relación con un cereal. *Skinner Mfg. Co.* v. *General Foods Sales Co.*, 52 F.Supp. 432 (1943).

(h) *"Hot patch"*, en relación con unidades de vulcanización y aparatos para reparar neumáticos. *Shaler Co.* v. *Rite-Way Products*, 107 F.2d 82 (6th Cir. 1939); *Speaker* v. *Shaler Co.*, 87 F.2d 985 (7th Cir. 1939).

(i) *"Lilas de France"*, en relación con un perfume. *Pinaud Inc.* v. *Huebschman*, 27 F.2d 531 (2d Cir. 1928). *cert. denied* 278 U.S. 644.

(j) *"Notaseme"*, en relación con medias sin costuras por ser una descripción corrupta de éstas. *Straus* v. *Notaseme Co.*, 240 U.S. 179 (1916).

Concluimos—con mayor razón que en los casos anteriores—que en el caso ante nos, el término "Rico" es descriptivo ya que corrientemente se usa en relación con bebidas o alimentos para significar que son gustosos, sabrosos, agradables o muy buenos.

■■■ 2.—Hemos adoptado en Puerto Rico la doctrina de la significación secundaria a la que hace referencia y reconoce el tribunal de instancia. Antes de seguir, es necesario explicar qué se entiende por esta doctrina. En *G. & C. Merriam* v. *Saalfield*, 198 Fed. 369 (6th Cir. 1912), se definió en forma concisa así:

"La teoría de la significación secundaria presupone que una palabra o frase, que originalmente y en su sentido primario no es susceptible de ser apropiada con exclusividad con relación a un artículo en el mercado por ser geográfica o de otro modo descriptiva, puede, sin embargo, haber sido usada por tanto tiempo y con tal exclusividad por un productor con referencia al artículo, de manera que en el mercado del artículo, y en aquella

parte del público que lo consume, la palabra o frase ha llegado a significar que el artículo es un producto; en otras palabras, ha llegado a ser para ellos su marca de fábrica. De manera que se ha dicho que la palabra ha adquirido una significación secundaria."

Como dice el comentarista Callman en su obra *"Unfair Competition and Trade Marks"*, 2d ed. vol. III, sec. 77.1, págs. 1223 y 1224, "Del esfuerzo del hombre de negocios y del reconocimiento público de esta significación secundaria surge un nuevo derecho de propiedad con derecho a ser protegida." En el *"Restatement of the Law Torts"*, vol. III, sec. 716, Comentario (b), pág. 560, se dice que la frase significación secundaria más bien quiere decir significación subsiguiente que se añade al significado anterior y llega a ser en el mercado la significación usual y primaria y añade: "La cuestión en cada caso consiste en si de hecho un número sustancial de compradores presentes o probables entienden la designación cuando se usa en relación con artículos, servicios o negocios, no en su sentido primario lexicográfico, sino con referencia a una persona o asociación en particular." Citamos la referida doctrina en *Eneglotaria Medicine Co.*, supra.

■ La determinación de si una palabra o frase descriptiva usada como designación de un artículo en el mercado ha adquirido una significación secundaria es una cuestión de hecho.

En *Armstrong Co.*, supra, se dijo que la marca "Nu-Enamel", aunque descriptiva, había adquirido una significación secundaria debido al uso de la misma en numerosos otros productos manufacturados por la recurrida, sus anuncios, en vitrinas de tiendas, en anuncios eléctricos y de otras clases, como nombre de muchas tiendas y como letrero de miles de traficantes y "Esto establece enteramente aparte de cualquier ley de marca de fábrica, el derecho en ley común de la Nu-Enamel Corporation de quedar libre del uso competitivo de tales palabras como marca de fábrica o nombre comercial

. . . . esté derecho no confiere un monopolio del uso de las palabras. Es una mera protección en contra de su uso desleal como marca de fábrica o nombre comercial por un competidor que trata de pasar sus productos como del usuario original de la marca. Este derecho de ser protegido de tal uso pertenece al usuario de la marca que ha adquirido una significación secundaria. En este sentido es el dueño de la marca . . . Cuando un nombre adquiere esta calidad (la de significación secundaria) se convierte en una marca con derecho a ser protegida".

En *Lift Truck Parts & Services Inc.*, supra, se dijo que la siguiente prueba sostenía la conclusión de que el nombre en cuestión había adquirido significación secundaria:

(a) Una encuesta realizada por una compañía de investigaciones entre personas que necesitaban el servicio y partes de *"lift trucks"*. Un veinte por ciento (20%) del mercado potencial estimado fue incluido en la encuesta. No es necesario que las personas entrevistadas sean citadas para testificar. (²)

(b) Tiempo durante el cual el demandante usó su nombre.

(c) Volumen de anuncios del nombre del demandante.

(d) La concentración relativa del público con quien las partes hacían negocios.

■ En *Keller Products*, supra, se concluyó que aunque la marca "Tub-Kove" era descriptiva había adquirido una significación secundaria a base de que el demandante había gastado $42,000 en anunciar su producto que puso en el mercado pocos años antes del pleito; que el producto recibió considerable anuncio gratis en las publicaciones del ramo del comercio; que el producto tuvo buena acogida en el mercado;

---

(²) En relación con estas encuestas, véase *Standard Oil Co.* v. *Standard Oil Co.*, 252 F.2d 65 (10th Cir. 1958), y la anotación titulada *"Admissibility and weight of surveys or polls of public or consumer's opinion, recognition preference, or the like*, 76 A.L.R.2d 619.

que *la evidencia debe considerarse en términos favorables al demandante;* que cuando uno usa la marca de otro, tiene el peso de justificar su uso y de demostrar que ha ejercido su derecho con razonable deferencia hacia los derechos del dueño de la marca.

■ Se ha dicho que el establecimiento de un significado secundario depende de la asociación que haga el público con una fuente particular aunque posiblemente anónima. El Juez Learned Hand ha fraseado la cuestión de la determinación de hechos en estos casos como sigue: "¿Qué es lo que los compradores entienden por la palabra cuyo uso motiva la contienda entre las partes"? *Bayer Co.* v. *United Drug Co.,* 272 Fed. 505 (D.C. N.Y. 1921). De manera que el sentir del público en relación con el uso de un término es el medio corrientemente articulado para determinar la existencia de una significación secundaria. A los fines de sostener la existencia de significación secundaria frecuentemente se ofrece en evidencia el testimonio de usuarios típicos de la clase de productos objeto de la contienda. Esta forma de establecer la significación secundaria se denomina la prueba por asociación. También se ha hecho uso extensivo de evidencia indirecta que dé base a una presunción de identificación por los usuarios de la persona que gestiona la protección para el uso de una palabra o frase. Evidencia de este tipo consiste de la cantidad y método de anuncio, duración de uso exclusivo y volumen de ventas. Se ha utilizado otra forma de determinar la significación secundaria, o sea, a base de prueba de que la marca se ha convertido en una propiedad de valor comercial sin darle mucha consideración a la fuente de asociación que haya hecho el público. Se ha recurrido a esta forma debido a la dificultad que existe en usar la anterior, pues bajo aquélla la determinación depende en gran parte de las declaraciones conflictivas de consumidores traídos como testigos por cada uno de los litigantes. A esos efectos muchos tribunales dan consideración al tiempo de uso, a los anuncios, al

volumen de venta y al esfuerzo realizado, más bien que a la asociación del consumidor. (³)

*Trade-Marks Secondary Meaning—Lack of Uniformity in Determining Secondary Meaning*—47 Iowa L. Rev. 781 (1962); *The Doctrine of Secondary Meaning*, 62 W. Va. L. Rev. 254 (1960); *Time as an element determining whether a descriptive term has acquired a secondary meaning entitling it to protection against unfair competition*, 40 A.L.R. 433.

En *Shaler Co.*, supra, se sostuvo que la frase *"hot patch"* había adquirido una significación secundaria porque "La prueba demostró que por muchos años la firma Shaler había usado la frase 'hot patches' en relación con su mercancía; que había gastado considerables sumas de dinero en introducir su producto en el mercado; había establecido un campo de actividad en escala nacional; había acumulado numerosos distribuidores de su producto; y había introducido anuncios enfatizando las palabras 'hot patches' ".

En *Eneglotaria Medicine Co.*, supra, dijimos en efecto, que la marca "Alcoholado Porto Rico" había adquirido una significación secundaria a base de los siguientes hechos establecidos por la prueba:

"Que allá por el año 1923, la demandante comenzó a fabricar y vender en esta Isla un alcoholado o *bay rum* con el nombre de 'Alcoholado Porto Rico' impreso o exhibido en el rótulo que se adhería a las botellas en que se envasaba el producto, el que se fabricaba conforme a una receta perteneciente a la demandante; y que el alcoholado de la demandante es preparado y fabricado

---

(³) En *The Doctrine of Secondary Meaning*, supra, se señalan tres limitaciones y condiciones en relación con la doctrina de significación secundaria, a saber:

(a) Si la palabra, frase o marca se apropió ilegalmente originalmente, la existencia de una significación secundaria no justifica que se continúe usando y se restringirá tal uso ilegal.

(b) El derecho de uso exclusivo del uso de la frase, palabra o marca sólo se hará efectivo dentro del área de su popularidad; y

(c) La significación secundaria no cubre el área de características de funcionamiento del producto.

por la Eneglotaria Medicine Co. en la ciudad de Nueva York.

"Que en aquel entonces (1923) el producto era desconocido en Puerto Rico, y la apelante inició una campaña para abrir y asegurar el mercado aquí, continuando dicha campaña hasta que se radicó este pleito; y como resultado de la misma, la demandante obtuvo grandes ventas.

"Que el producto era conocido por el público como 'Porto Rico' o 'Alcoholado Porto Rico'."

En *Armstrong Co.*, supra, también se dijo que "Los hechos para sostener una causa de infracción (de marca de fábrica registrada) y una de competencia desleal (por el uso de una marca indebidamente registrada) son sustancialmente los mismos.

■ En el caso ante nos, el tribunal de instancia incurrió en error al llegar a la conclusión de que no se había probado la significación secundaria atribuida a la marca "Rico". Hemos examinado cuidadosamente el récord del testimonio oral y la prueba documental admitida en las vistas del caso y a nuestro juicio se estableció plenamente que el conjunto de colores, diseño y las palabras "Café Rico" en la rotulación de la bolsa de la recurrente han adquirido una significación secundaria en el mercado de café tostado y molido en Puerto Rico debido a las siguientes circunstancias:

(a) En 1936 la recurrente adquirió por compra la marca "Café Rico" registrada en Puerto Rico y la marca "Rico" registrada en la Oficina de Patentes de Estados Unidos y la ha usado continua y ostensiblemente desde entonces excepto que en 1948 inscribió dicha marca con un diseño especial impreso en las bolsas en que envasa y vende su café tostado y molido que ha venido usando desde entonces para dichos fines, un specimen del cual aparece en el Exhibit 1 de esta opinión.

(b) El café tostado y molido de la recurrente se ha identificado por el comercio y el público a través de la referida bolsa, habiéndose vendido en tales envases cerca de seis millones de libras al año de dicho producto a través de todo el Estado Libre Asociado de Puerto Rico.

(c) Que para desarrollar ese mercado y lograr esa venta de café, la recurrente ha establecido una torrefacción en Ponce y otra en San Juan y ha establecido una organización para cubrir toda la Isla y una campaña de promoción y anuncios que cuesta más de $100,000 al año. El producto se vende en todo Puerto Rico, en mercados, supermercados, tiendas y negocios. La reclamante vela celosamente por la venta de este producto y para ello siempre mantiene una buena campaña de anuncios, un buen personal, un buen grupo de vendedores de café en Puerto Rico. Vende más o menos un 30% de todo el café tostado y molido consumido en Puerto Rico.

3.—Establecido que la marca "Café Rico" en la rotulación utilizada por la recurrente desde el 1948 ha adquirido una significación secundaria y por lo tanto debe ser protegida contra su uso desleal por un competidor, procede determinar si en efecto el recurrido incurrió en la práctica desleal de que se queja la recurrente. El tribunal de instancia determinó que la semejanza que existe entre las bolsas de café de los litigantes no es sustancial y que existen diferencias obvias entre los rótulos de las bolsas de cada uno de ellos; que aunque existe la posibilidad de confusión entre ambas no puede concluirse que haya probabilidad razonable o sustancial de confusión de parte de personas que usen cuidado ordinario; que la evidencia sobre los casos de confusión no ha merecido la confianza y el crédito del tribunal. Indudablemente a base de lo expuesto en el párrafo marcado 5 del resumen que previamente hicimos de las determinaciones de hecho del tribunal de instancia, éste concluyó que esa conducta del recurrido estuvo justificada y no resulta de sus actos que haya tenido la intención fraudulenta ni fue su conducta ilegal y deshonesta de manera que se justifique concluir que ha realizado una competencia ilegal contra la cual debe protegerse a la recurrente.

A los fines de resolver, es necesario hacer un breve resumen del estado del derecho con respecto a esta cuestión.

■ Aunque la apreciación de la prueba oral de un tribunal de instancia merece el mayor respeto y consideración, no es menos cierto que en la apreciación de la prueba documental este tribunal se halla en las mismas condiciones que el tribunal sentenciador. *Central Igualdad, Inc.* v. *Srio. de Hacienda*, 83 D.P.R. 45 (1961).

En *Harold F. Ritchie, Inc.* v. *Chesebrough-Pond's Inc.*, 281 F.2d 755, 757 (2d Cir. 1960), se dijo que "Cada caso de una alegada infracción de marca de fábrica debe juzgarse a base de sus propios hechos y la cita de autoridades no es de mucha ayuda, excepto en lo que pueda establecer un patrón general". La prueba *(test)* decisiva es la cuestión de hecho con respecto a la posibilidad de confusión por un consumidor corriente y prudente de los artículos en cuestión. *Nebraska Consol. Mills Co.* v. *Shawnee Milling Co.*, 198 F.2d 36 (10th Cir. 1952).

En *Eneglotaria*, supra, al resolver que el demandado era culpable de competencia desleal al vender en Puerto Rico su alcoholado bajo la marca "Gloria de Puerto Rico" desde el 1924 cuando el demandante vendía en esta jurisdicción su alcoholado bajo la marca "Alcoholado Porto Rico" desde el 1923, dijimos: *"El colorido general de ambos rótulos es lo suficientemente parecido para engañar a una persona que no tenga experiencia con cualquiera de los dos frascos o que no los tenga juntos uno al lado del otro, a pesar de que ambos diseños son enteramente distintos y de que existe marcada diferencia entre los colores;* que si una persona que usara el 'Alcoholado Porto Rico' se lo mostrara casualmente a alguien y se lo recomendara, la persona a quien se le hizo la recomendación fácilmente podía ser engañada al solicitar 'Alcoholado Porto Rico' ". (Énfasis nuestro.)

En *Jackson Brewing Co.* v. *José B. López, Sucrs.*, 51 D.P.R. 719 (1937), confirmamos la prohibición permanente de que la demandada usara la palabra "Jax" en parte alguna de su marbete o cartones en relación con la venta de su cer-

veza en Puerto Rico, no obstante venderse bajo la marca "Royal Palm", porque en su etiqueta aparecía la frase "Jax Brewing Company, Jacksonville, Florida", y la prueba "que quizás no era tan clara, como hubiera podido serlo, tendiente a demostrar que los vendedores del agente principal de la demandante [Jackson Brewing Co., de Louisiana] (que vendía su cerveza en Puerto Rico bajo la marca registrada "Jax"] tenían dificultad en vender su cerveza porque las personas a quienes se acercaban alegaban tener una cerveza más barata procedente de la Jackson Brewing Co.", que "De la prueba se desprende que existía el peligro de que se perjudicara la reputación de la peticionaria; que el uso por parte de la demandada del monosílabo 'Jax' aunque se hiciera en relación con su nombre corporativo lleva consigo la probabilidad de que al venderse el producto en cartones (al por mayor) . . . los detallistas podían ser erróneamente inducidos a creer que ambos productos eran fabricados por el mismo cervecero y adquirir así una cerveza basándose en la reputación de la otra."

En *Kellogg Co.* v. *Nat. Biscuit Co.*, 305 U.S. 111 (1938), se denegó un *injunction* para prohibir el uso de las palabras "*shredded wheat*", entre otras razones porque el uso de estas palabras y de un diseño del producto se llevó a cabo de buena fe. El producto de ambos litigantes se vendía en cajas de cartón que no se parecían ni en tamaño, ni en forma, ni en color; las diferencias en las etiquetas eran sustanciales indicándose con prominencia el nombre del productor. *Sin embargo, se prohibió que en los cartones se utilizara una fotografía de dos unidades del producto en un plato de leche por ser muy similar a las de una marca registrada del demandante.*

En *Straus*, supra, el Juez Holmes concluyó que era competencia desleal usar la marca "Irontex" dentro del mismo diseño de la carca "Notaseme"; que era competencia desleal

usar un rótulo similar. No hubo prueba de que se realizó un engaño o sustitución de hecho.

En *Arnold, Schwinn & Co.* v. *Evans Products Company*, 302 F.2d 765 (1962), se dijo que las respectivas marcas deben considerarse en su totalidad al determinar si la del demandado al aplicarse a su producto tiene la posibilidad de causar confusión, o equivocación, o engaño a los compradores debido a su similitud con la del demandante. Cuando los diseños son similares y las palabras distintas, la cuestión de cuál de las dos características domina la marca es igualmente determinante de la cuestión con respecto a la posibilidad de confusión.

En *Q-Tips Inc.* v. *Johnson & Johnson*, 206 F.2d 144 (3d Cir. 1953), se dijo que uno de los factores a considerar es la intención del que adopta la designación objetada. En este caso la demandada anteriormente usaba el término *"Cotton Tipped Applicators"*. Era descriptivo y no atractivo. Se sometió el asunto a una agencia de anuncios. Se sugirieron muchos nombres completamente distintos de lo que el producto sugería. Al fin se adoptó *"Cotton Tips"*. Se resolvió que resultaba claro por qué, entre todas las posibilidades, la demandada adoptó este término. No se había usado *"Tips"* en relación con el producto hasta que la demandante diseñó *"Q-Tips"*, producto que gozaba de gran popularidad bajo esa marca al extremo que la demandante producía el 90% de los palillos con algodón (*swabs*) usados en Estados Unidos. Se consideró que la evidencia en este caso era convincente de que la demandada escogió *"Cotton Tips"* como manera de acercarse a *"Q-Tips"* tanto como legalmente pudiese y gozar así de la popularidad del nombre del demandante.

En *Keller Products*, supra, se indicó que aunque los colores y diseños de las marcas eran distintos cuando se examinan en su totalidad, resultaba aparente que el demandado estaba usando las características predominantes de la marca del demandante. En este caso no se presentó prueba de que

el paquete del demandado engañase a alguna persona y le indujese a creer que estaba comprando el paquete del demandante. Se dijo que no era necesario presentar casos de confusión *pues la cuestión decisiva es si existe la posibilidad de tal confusión. Es suficiente que el tribunal entienda que el engaño era el resultado probable de los actos del demandado.* Independent Nail & Pack. Co. v. Stronghold Screw Prod., 205 F.2d 921 (7th Cir. 1953); *Esso Inc.* v. *Standard Oil Co.,* 98 F.2d 1 (8th Cir. 1938); *Esquire Inc.* v. *Maira,* 101 F. Supp. 398 (D.C. Pa. 1951); *Majestic Mfg. Co.* v. *Kokenes,* 67 F.Supp. 282 (D.C. Ala. 1946).

En *B. Di Medio & Sons* v. *Camden Lumber & Millwork Co.,* 93 A.2d 45 (N.J. 1952), se resolvió que en una acción para restringir el uso de una marca porque infringe una marca descriptiva que ha adquirido una significación comercial, el demandante no tiene que probar que el demandado usó el nombre con intención premeditada de causar daño al demandante o de engañar al público; es suficiente que las consecuencias del acto del demandado predominen sobre la calidad de su motivo.

En *Independent Nail & Pack. Co.,* supra, se dijo que para infringir una marca de fábrica no es necesario copiar toda la marca, que la imitación puede ser tenue si se refiere a lo que es sobresaliente; y es suficiente si uno adopta una marca tan parecida a otra en la forma, ortografía y sonido, que una persona con un recuerdo no muy definido en cuanto a la verdadera marca probablemente se confunde o engaña; que no es necesario que el demandante pruebe casos actuales de confusión, pues el *"test"* determinante es si existe la posibilidad de tal confusión debido a la similitud entre las marcas.

En *Time, Inc.* v. *Life Television Corp.,* 123 F.Supp. 470 (D.C. Minn. 1954), se señaló que en caso de la naturaleza antes indicada cualquier *duda en cuanto a la efectividad del remedio debe resolverse en contra del demandado.*

En su sentencia dictada en el caso de *Cafeteros de Puerto Rico* v. *Picó Hermanos*, Civil Núm. T-1891, el Tribunal Superior, Sala de Ponce, decretó un *injunction* para restringir el uso de una bolsa de papel en relación con la venta de café tostado y molido por ser dicho envase similar en color y diseño al que la recurrente trata de proteger en este caso excepto que en aquél se usaba la palabra "Café" y debajo la palabra "Pico".

4.—Consideremos ahora si en efecto existió la posibilidad de confusión que da base para establecer un caso de competencia desleal. En el Exhibit 1 que se ha unido como parte de esta opinión aparecen los rótulos de las bolsas de los litigantes en que envasan el café que venden en el mercado de Puerto Rico y que son motivo de este litigio. Como señaló el tribunal de instancia, el recurrido cambió su anterior diseño en el cual, al igual que muchos otros competidores en la venta de café tostado y molido en el mercado de Puerto Rico, daba la mayor prominencia a su marca "Flor de Borinquen" y en donde aparecía el término "Puro de Puerto Rico" escrito debajo en letras mucho más pequeñas. El cambio consistió en subir al tope del rótulo la expresión "Café Puro de", más abajo las letras "Pto" y debajo, cubriendo el mayor espacio en rojo, aparece la palabra "Rico", escrita en forma prominente y sesgada a través del espacio indicado. De las muestras de bolsas usadas por diversos productores de café tostado y molido en Puerto Rico que fueron admitidas en evidencia, es aparente que aunque el uso de los colores rojo y negro es común en muchas, ninguna contiene la imitación de la bolsa de la recurrente que es aparente de la del recurrido, observándose en aquéllas, contrario a la de éste, especial cuidado tanto en diferenciar sus diseños como en destacar prominentemente sus respectivas marcas. En ninguna de ellas existe el pronunciado parecido con la bolsa de la recurrente que el recurrido ha logrado en la suya y en ninguna se ha seguido el arreglo especial para dificultar y relegar la

marca del productor a un sitio secundario destacándose prominentemente en su lugar la palabra "Rico". Aunque no era necesaria, se presentó alguna prueba oral en el caso con respecto a la existencia en el mercado de Puerto Rico de confusión real y efectiva entre las bolsas de los litigantes la cual merece credibilidad al pesarse conjuntamente con las fotografías que constan en el récord de escaparates de tiendas en los cuales aparecen bolsas de café de ambos litigantes mezcladas entre sí, bien por los consumidores o por empleados del establecimiento, quienes indudablemente no se dieron cuenta, en el curso ordinario de sus actuaciones, de la diferencia existente entre ambas envolturas y por el contrario deben haber sido confundidos por la similitud entre ellos la cual, a nuestro juicio, era sustancialmente mayor que la que dio lugar al *injunction* en *Eneglotaria*, supra; *Jackson Brewing Co.*, supra; *Straus*, supra; *Q-Tips*, supra; y *Cafeteros de Puerto Rico* v. *Picó Hermanos*, supra. El hecho que luego de inscrita su marca la recurrente modificase su bolsa, primero para añadir en la tapa, en forma repetida las palabras "Café Rico" en fondo blanco, otros impresos a los lados, y, luego de radicada la demanda para añadir una etiqueta o sello blanco en el fondo de su bolsa con las palabras "Café Rico" escritas en negro, no altera la realidad de que existe tan marcada similitud entre ambas bolsas que existe la posibilidad de que el producto de los litigantes se confunda en el mercado y se compre el uno por el otro. Estos cambios más bien tendían a diferenciar un tanto más las envolturas en cuestión y no a acentuar su similitud como concluyó el tribunal de instancia. El examen que hemos hecho del récord y de la prueba documental admitida en el caso, nos lleva a la conclusión que el recurrido cambió la rotulación de sus bolsas con el propósito de aumentar sus ventas, las que venían reduciéndose durante los años anteriores a 1958, y a esos efectos, al darle prominencia a la palabra "Rico" dentro de un diseño muy parecido al de la recurrente, necesariamente trataba de apro-

vecharse de la plusvalía de la recurrente, del favor que a su juicio, como lo indica el tribunal de instancia, gozaba la marca "Café Rico" en el mercado. Estas circunstancias son similares a las de *Q-Tips Inc.*, supra. A tenor con lo resuelto en *Time, Inc.*, supra, la conclusión es inescapable que el recurrido se propuso continuar sus negocios a base de imitar lo más posible la marca y la rotulación en la bolsa de la recurrente con el fin de aumentar sus ventas mediante el indebido aprovechamiento de la plusvalía de la recurrente y que "Una determinación de que esto trae la posibilidad de confusión está sostenida por las autoridades".

■ 5.—El tribunal de instancia incurrió en error al concluir que la recurrente no es acreedora a remedio alguno en equidad debido a su incuria en solicitarlo y a su conducta demostrativa de falta de conciencia limpia.

Dicho tribunal basa su conclusión sobre la incuria de la recurrente en que ésta ha permitido el uso por el recurrido de envases con la misma combinación de colores y presentación general del envase, "lo que dio lugar a que el recurrido se sintiese en la confianza de que podía usarlas y conservarlas como hizo al modificar la rotulación en 1958 dando gran prominencia a la expresión 'Café Puro de Pto. Rico' ". Lo que la prueba demuestra es un caso claro de infracción progresiva que culminó en el referido cambio realizado por el recurrido en 1958 que motivó la inmediata solicitud del recurrente por carta dirigida al recurrido para que éste desistiese de dicho cambio y que dio lugar, poco después, a la radicación de la acción en este caso en vista de que el recurrido no modificó en forma alguna su actuación. *Independent Nail & Pack. Co.*, supra; *Rothman* v. *Greyhound Corporation*, 175 F.2d 893 (4th Cir. 1949). De manera que en realidad no puede concluirse que la recurrente incurrió en la alegada incuria y que por el contrario fue diligente en gestionar la protección de su derecho.

Tampoco existe fundamento para concluir que la conducta de la recurrente es demostrativa de falta de una conciencia limpia debido al cambio realizado en su marca luego de radicarse esta acción, según explicamos previamente, o porque el uso de la marca "Rico" sugiere que el café de la recurrente es "el único puro de Puerto Rico en este mercado" o porque el uso de la marca "Café de Puerto Rico" en relación con café crudo además de la marca "Rico" para el tostado y molido, tiende así a monopolizar el uso del vocablo "Rico" en relación con el mercado de café o porque el diseño, rótulo y colorido de la marca "Rico" registrada son distintos de los invocados en el caso, o porque la marca había caducado, o porque alegó el indebido uso por el recurrido de la palabra "Rico" aislándola de la abreviatura "Pto" que la precede, o porque pretende usar una palabra descriptiva y una combinación de colores que son de dominio público. Nada aparece en el récord que justifique estas conclusiones ni que demuestre una falta de conciencia limpia de parte de la recurrente que justifique denegarle el remedio en equidad que solicita.

6.—En cuanto a los daños sufridos por la recurrente, convenimos con el tribunal de instancia que las partidas alegadas por la recurrente sobre las cuales se recibió prueba, son hipotéticas y especulativas, pues la prueba demuestra que las ventas así como las ganancias de la recurrente han continuado en aumento y no se demostró que, en efecto, el dejar de alcanzar las metas de ventas, y por lo tanto de obtener los beneficios correspondientes, que se impuso la recurrente se debiera a las actuaciones objetadas del recurrido. Lo mismo puede decirse en cuanto al aumento en gastos adicionales de venta y para activar la propaganda y mitigar los daños.

7.—Es obvio de la exposición precedente que el tribunal de instancia erró al declarar sin lugar la demanda y al imponer a la recurrente el pago de honorarios de abogado (errores 1 y 7 previamente relacionados).

KODAK COLOR CONTROL PATCHES

These colors have been selected as representative of those inks commonly used in photomechanical reproduction

black · 3-color · white · cyan · violet · magenta · primary red · yellow · green

Ech. 8

Ech. 1

*Por lo tanto, se revocará la sentencia del tribunal de instancia y en su lugar se declarará la demanda con lugar y, en tal virtud, se ordenará la expedición de un auto de injunction permanente prohibiendo al recurrido, a sus agentes y empleados, sus sucesores o cesionarios, que continúen el uso del envase objetado a menos que lo modifiquen para conformarlo a la práctica establecida en el mercado de café de Puerto Rico, como por ejemplo, figurando prominentemente el recurrido su marca "Flor de Borinquen", tanto en el rótulo principal de su bolsa como en los costados y extremos de la misma, pudiendo mantener impresa la expresión "Café Puro de Puerto Rico" en algún lugar de su rótulo, debajo de dicha marca, en letras regulares de tamaño un tanto mayor que las usadas previamente para este fin por el recurrido. Se condenará al recurrido al pago de las costas inclusives las de esta revisión, así como al pago de honorarios de abogado en la suma de $1,000.*