POSADAS DE PUERTO RICO ASSOCIATES INCORPORATED, demandante y recurrida, *v.* SANDS HOTEL & CASINO, INC., PRATT HOTEL CORPORATION, SOUTHMARK SAN JUAN, INC. y SJPR, INC. h/n/c SANDS HOTEL & CASINO DE SAN JUAN, demandados y recurrentes.

*Número:* RE-88-165 *Resuelto:* 30 de junio de 1992

24

*José Bermúdez Torregrosa*, de *Cuevas Kuinlam & Bermúdez*, abogado de la recurrente; *Francisco de Jesús Schuck* e *Iván C. Reichard*, de *Fiddler, González & Rodríguez*, abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

A los fines de lograr acceso a cierto tipo de clientela exclusiva, la aquí recurrida, dueña del Hotel Condado Plaza (anteriormente Condado Holiday Inn), decidió establecer en dicho Hotel un concepto novedoso en Puerto Rico en junio de 1980 bajo el nombre de "Plaza Club". Dicho concepto, que se conoce comúnmente en la industria hotelera como *concierge level*, está orientado a prestar unos servicios exclusivos dirigidos a ejecutivos, profesionales, turistas, y jugadores de casino, entre otros.[1] En esencia, se trata de "un hotel dentro de un hotel", donde el huésped, a cambio de una tarifa más alta, recibe una serie de servicios adicionales a los que se ofrecen en el resto del hotel. Estos servicios los proveen un grupo de personas entrenadas y dedicadas exclusivamente a llenar las necesidades de dicho

---

[1] Sus huéspedes básicamente se dividen, porcentualmente, en tres (3) grupos:

a) 70% Ejecutivo corporativo comercial.

b) 25% Jugadores profesionales de casino o turistas recomendados por agencias de pasajes.

c) 5% Grupos y convenciones.

huésped proporcionándole a éste servicios y comodidades de lujo.

Los servicios especiales del Plaza Club incluyen, entre otros, salones de conferencia, atención individualizada, sala de lectura, biblioteca, barra, servicio de secretarias y equipo de oficina y acceso controlado exclusivamente para dichos huéspedes. Inicialmente el Plaza Club se ubicó en uno de los pisos del Condado Plaza, el cual fue lujosamente remodelado. Debido al éxito obtenido por el Plaza Club, dos (2) años más tarde la gerencia optó por adicionar otro piso para dicho concepto y así poder dar cabida a la demanda obtenida. En la remodelación de las facilidades físicas, mercadeo y promoción del producto, el hotel recurrido invirtió aproximadamente un total de un millón y medio de dólares.

La promoción de estos servicios consiste en el envío de correspondencia directa y literatura promocional masiva a corporaciones multinacionales y agencias de viajes, en adición a los anuncios que se publican en revistas de Estados Unidos y Puerto Rico. El mercadeo de Plaza Club es coordinado a través de sus oficinas localizadas en Puerto Rico, Miami y Nueva York.

Aunque este concepto ya se había desarrollado en hoteles de Estados Unidos, el Hotel recurrido fue el primero en adoptarlo en la industria hotelera de Puerto Rico. A partir del comienzo de operaciones del Plaza Club, hoteles locales de la competencia implementaron servicios similares con sus propios nombres distintivos, a saber: Hotel Caribe Hilton—"Vista Club"; Hotel Condado Beach—"Vanderbilt Club"; Hotel Cerromar—"Regency Club"; Hotel Palace—"Crown Club"; y el Hotel Dupont Plaza—"Executive Floor".

La presente controversia se origina a mediados del año de 1987, cuando la co-demandada Sands Hotel & Casino comienza sus operaciones como hotel e incluye un área de *concierge level* con el nombre de "Sand's Plaza Club".

El Sr. Hugh Andrews, presidente de la corporación que

opera el Condado Plaza, al enterarse que el Sands Hotel utilizaría el nombre "Sands Plaza Club" para su *concierge level*, requirió del Sands —por carta fechada el 19 de agosto de 1987— que desistieran de usar dicho nombre, advirtiéndole que este era "propiedad" del Hotel Condado Plaza. El Sands, por su parte, rechazó que el nombre "Plaza Club" perteneciera al Hotel demandante. No conforme con dicha contestación, la demandante Posadas de Puerto Rico Assoc. Inc., instó ante el Tribunal Superior de Puerto Rico, Sala de Carolina, demanda sobre *injunction* preliminar y permanente.

Según el testimonio del Sr. Edward Tracy, Gerente General del Sands Hotel, quedó establecido que el Sands Plaza Club es un concepto de servicios de lujo a clientela exclusiva, independientemente de aquellos servicios que ordinariamente ofrece el hotel. Declaró, además, que al igual que la parte demandante, el mercado hotelero que persiguen proviene sustancialmente de los Estados Unidos. El señor Tracy, sin embargo, trató de distinguir los servicios ofrecidos por el Sands Hotel & Casino, de aquellos del Condado Plaza Hotel. Declaró que la distinción básica versa en que sus servicios son ofrecidos a jugadores que apuestan en el casino cuantiosas sumas de dinero y que, a cambio, el hotel les facilita ciertas comodidades especiales libre de costo. Admitió, sin embargo, que las habitaciones y facilidades están disponibles para todo aquel que esté dispuesto a pagar sus tarifas. Indicó que el piso tercero del Sands Hotel será renovado para ofrecer servicios como computadoras portátiles, salones de conferencia y área de descanso. Ante tal ampliación, el señor Tracy admitió que podían verse obligados a mercadear sus servicios a cuentas corporativas o de ejecutivos. El señor Tracy señaló, además, que existe una distinción en la decoración del servicio que ofrecen, y el estilo que quieren proyectar. Estableció una diferencia en el precio de ambos servicios y sobre la localización de los servicios en los respectivos

hoteles. El del Condado Plaza se encuentra en los pisos noveno y décimo del mismo mientras que en el Sands se encuentra en un ala independiente del hotel. En cuanto al precio estableció una marcada diferencia: de $200–240 el Condado Plaza a $310–750 el Sands Hotel.

El tribunal de instancia dictó sentencia parcial declarando con lugar la demanda, concediendo, al amparo de la Regla 57 de Procedimiento Civil, 32 L.P.R.A. Ap. III, *injunction* permanente a favor del demandante y ordenando al demandado a abstenerse de utilizar el nombre "Sands Plaza Club" Le ordenó, en adición, que destruyera los papeles y materiales de promoción donde aparezca el nombre de Sands Plaza Club. El tribunal de instancia concluyó que: (1) el nombre "Plaza Club" no es genérico por tener un significado secundario en nuestra industria hotelera, y(2) que el uso del nombre "Sands Plaza Club" por la parte demandada crea una *posibilidad* de confusión por lo que procedía el *injunction* solicitado.

Inconforme, los demandados recurrieron —vía revisión— ante este Tribunal, imputándole al foro de instancia haber errado al concluir que:

a) ... existe una posibilidad de confusión por el uso del nombre "Sands Plaza Club" ...;

b) ... la mera "posibilidad" de confusión bastaba para emitir el injunction;

c) ... la palabra "Plaza" y la frase "Plaza Club" no son nombres genéricos dentro de la industria hotelera;

d) ... hay un significado secundario mediante el cual los clientes de Condado Plaza identifican a "The Plaza Club" con dicho hotel;

e) ... el hecho de que los dos productos vayan dirigidos a distintos mercados es inmaterial;

f) ... existe similaridad en los nombres que crea una posibilidad de confusión;

g) ... la [m]oción sobre [d]eterminaciones de [h]echos, [c]onclusión de [d]erecho [a]dicionales y de [r]econsideración presentados por las recurrentes [no tengan mérito suficiente como para haberlas declarado con lugar;]

h) [el pago de honorarios de abogados proceda contra las recurrentes ante un punto tan novel;]
i)[la apreciación de la prueba estuvo.correcta, y;]
j) [el injunction solicitado por la recurrente sea procedente en derecho.] Solicitud de revisión, págs. 4–5.

Expedimos el auto solicitado, *ordenando la paralización de los procedimientos a nivel de instancia hasta tanto otra cosa dispusiera este Tribunal.* Estando en condiciones de resolver el recurso, procedemos a así hacerlo.

 La presente controversia se encuentra plasmada en el derecho marcario de servicios. Una "marca de servicio" (*service mark*) es aquella "utilizada en la venta o promoción de servicios que identifica los servicios que presta una persona o institución y los distingue de los servicios de otras". (Traducción nuestra.) Lanham Trademark Act., Sec. 45 (15 U.S.C. sec. 1127). Dicha marca identifica un servicio en que no está envuelta la manufactura ni la venta de bienes, por lo que difiere a una "marca de fábrica" en que no identifica un objeto tangible. A pesar de esta diferencia, tanto las marcas de fábrica como las de servicio, sirven el mismo propósito, esto es, el de identificar la fuente de los bienes o servicios, protegiendo la "plusvalía" (*goodwill*) del negocio y protegiendo a los consumidores desde el punto de vista que éstos pueden distinguir entre productos que compiten entre sí. *Park'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1984).

 La original Ley de Marcas de Fábrica de Puerto Rico, Ley Núm. 66 de 28 de julio de 1923, según enmendada, 10 L.P.R.A. sec. 191 y ss., no contemplaba las "marcas de servicios" y no le brindaba a éstos protección registral en el Departamento de Estado.(2) Nada impide, sin

_____

(2) La citada Ley Núm. 66 , ley vigente a la fecha de la ocurrencia de los hechos en el presente caso, fue derogada por la Ley Núm. 63 de 14 de agosto de 1991 (10 L.P.R.A. sec. 171 *et seq.*), estatuto que sí contempla las "marcas de servicio" y que entró en vigor el 14 de febrero de 1992.

embargo, que una "marca de servicio" reciba protección en nuestra jurisdicción al amparo de la doctrina sobre competencia desleal o ilícita. A esos efectos, véanse: 3 *Callman, The Law of Unfair Competition, Trademarks and Monopolies* Sec. 17.15, pág. 60 (1983); *Gilbert/Robinson v. Carrie Beverage-Missouri Inc.*, 758 F. Supp. 512 (E.D.Mo. 1991); *Armstrong Co. v. Nu-Enamel*, 135 U.S. 325 (1938). Como es sabido, la doctrina sobre competencia desleal o ilícita ha sido aceptada y aplicada por este Tribunal. *Eneglotaria Medicine Co. v. Sosa López*, 38 D.P.R. 604 (1928); *Cooperativa Cafeteros v. Colón Colón*, 91 D.P.R. 372 (1964); *Reynal v. Tribunal Superior*, 102 D.P.R. 260, 264 (1974); *Colgate-Palmolive v. Mistolín*, 117 D.P.R. 313 (1986).

La referida doctrina sobre competencia desleal tiene como fin que los tribunales otorguen un remedio a un comerciante afectado por actos deshonestos, injustos o injustificables de otro, el cual trata de ofrecer al público los bienes o servicios del primer comerciante como los suyos. A esos efectos la jurisprudencia federal ha resuelto que "[t]he rule is well-settled that nothing less than conduct tending to pass off one man's merchandise or business as that of another will constitute unfair competition". *Socony-Vacuum Oil Co. v. Rosen*, 108 F.2d 632, 635 (6to Cir. 1940); *Callman*, ante, Vol. 1, Sec. 2.02, pág. 6; *Elgin Nat'l Watch Co. v. Illinois Watch Case Co.*, 179 U.S. 665, 674 (1950); *Coats v. Merrick Thread Co.*, 149, 562, 566 (1893). De esta manera se protege al comerciante honesto y al público de ser engañado a la vez que se promueve la competencia justa. Las acciones por infracción a "marcas de fábrica" son una rama derivada de la amplia gama de acciones basadas en competencia desleal. *New West Corp. v. NYM Co. of*

---

Bajo la Ley Federal de Marcas de Fábrica conocida como el Lanham Trademark Act, Sec. 3 (15 U.S.C. sec. 1053), las marcas de servicio *sí* son inscribibles en el Departamento de Patentes y Marcas de Fábrica Federal en Washington D.C. y gozan de la misma protección de una marca de fábrica. *American Intern. Group v. American Intern. Bank*, 926 F.2d 829 (9no Cir. 1991).

*Cal., Inc.*, 595 F.2d 1194 (9no Cir. 1979); *Bowmar Instrument Corp. v. Continental Micro.*, 497 F. Supp. 947 (S.D. N.Y. 1980); *American Optical Corp. v. North American Optical*, 489 F. Supp. 443 (N.D. N.Y. 1979). En una acción por infracción a "marca de fábrica" están presentes, de ordinario, los actos necesarios constitutivos de competencia desleal. *Armstrong Co. v. Nu-Enamel*, supra, pág. 325; *Neely v. Boland Manufacturing Co.*, 274 F.2d 195, 203 (8vo Cir. 1960).

Resolvemos, en consecuencia, que la acción por violación a una "marca de servicio" debe ser analizada en nuestra jurisdicción al amparo de la doctrina sobre competencia desleal o ilícita utilizando el análisis contenido en las decisiones emitidas bajo la Ley de Marcas de Fábrica de Puerto Rico. *Colgate-Palmolive v. Mistolín*, ante, pág. 322. Ahora bien, y como consecuencia del hecho que la referida Ley se deriva de la Ley de Marcas Federal, resulta de gran valor persuasivo la jurisprudencia interpretativa de la Ley Federal. *Colgate-Palmolive v. Mistolín*, ante, pág. 323.

I

Una persona o corporación tiene un derecho propietario sobre una "marca de fábrica o de servicio" cuando dicha marca es usada en conexión con su producto o servicio para indicar su origen y distinguirlo de otros. *Discount Muffler Shop, Inc. v. Meineke Realty Corp., Inc.*, 535 F. Supp. 439 (N.D. Ohio 1982); *Estate of Presley v. Russen*, 513 F. Supp. 1339 (D. N.J. 1981). Véase, además, *Colgate-Palmolive v. Mistolín*, ante, pág. 322. El derecho propietario de una marca es obtenido por su uso y no por su inscripción. *Union Nat. Bank, Laredo v. Union Nat. Bank, Austin*, 909 F.2d 839 (5to Cir. 1990); *Gilbert/Robinson Inc. v. Carrie Beverage-Missouri*, ante; *Callman*, ante, Vol. 4A,

36

Sec. 25.03, pág. 17; E.C. Vandenburgh, *Trademark Law and Procedure*, 2da ed., Nueva York, Ed. The Bobbs-Merrill Company, 1968, pág. 53; *Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.*, 537 F. Supp. 587 (D.P.R. 1982). Este derecho propietario, el cual permite el uso exclusivo de una marca pertence al que *primero* utilice la marca dentro de la jurisdicción que ofrece la protección jurídica.[3] *Colgate-Palmolive v. Mistolín*, ante. Sin embargo, este derecho es uno limitado. El primer usuario de una marca no puede excluir el uso posterior de dicha marca por parte de otros usuarios en áreas en donde actualmente no hace negocios o donde no es probable que lo realice en un futuro. *Union Nat. Bank, Laredo v. Union Nat. Bank Austin*, ante; *Hanover Milling Co. v. Metcalf.*, 240 U.S. 403 (1915). Tampoco puede reclamar este derecho si ha dejado de utilizar, o ha abandonado, la marca. *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 91, 101 (5to Cir. 1983). Por último, el dueño de una marca no puede impedir que otros utilicen una marca similar si esta última no crea una *probabilidad* de confusión al consumidor.

Estas limitaciones son manifestaciones de *dos* (2) principios fundamentales del derecho marcario, los cuales tienen el fin de promover la competencia en el sentido de proteger a los consumidores de confusión y monopolio, y, en segundo lugar, el de proteger la reputación y la "plusvalía" (*goodwill*) que una marca haya obtenido. A estos efectos se señaló en *Hanover Milling Co. v. Metcalf.*, ante, pág. 413:

> ... trade-marks, and the right to their exclusive use, are of course to be classed among property rights ... but only in sense that a man's right to the continued enjoyment of his trade reputation and good-will that flows from it, free from unwarran-

---

[3] Las marcas de fábrica sólo reciben protección jurídica dentro de determinado mercado y jurisdicción por lo que lo relevante es el uso de la marca o símbolo en Puerto Rico. *Colgate-Palmolive v. Mistolín*, 117 D.P.R. 313, 325 (1986).

ted interference by others, is a property right, for the protection of which a trade-mark is an instrumentality. (Cita omitida.)

█ Una parte que solicita un *injunction* por infracción de "marca de fábrica o servicio" en nuestra jurisdicción tiene que demostrar, para poder prevalecer, que: el nombre sobre el cual desea la exclusividad sobre determinado producto o servicio es protegible o está sujeto a ser apropiado por quien lo reclama; que él fue el que primero lo utilizó en conexión con su producto o servicio en este foro, esto es, Puerto Rico; que existe una probabilidad de confusión al consumidor entre su marca y la del demandado; y finalmente, debido a que el demandante solicita un remedio en equidad, debe demostrar que dicha probabilidad de confusión le causa un daño irreparable para el cual no posee otro remedio adecuado en ley.

## II

█ La determinación de si una palabra o frase es elegible a ser protegida bajo el derecho marcario depende de la categoría a que dicha palabra o frase pertenece. Para propósitos de este análisis marcario, las marcas se dividen en cuatro (4) categorías, a saber: arbitrarias o imaginables, sugestivas, descriptivas y genéricas. *Colgate-Palmolive v. Mistolín*, ante, págs. 326–327.

█ La *marca arbitraria o imaginable* no guarda relación con las características del producto o servicio que identifica la marca. Las *marcas imaginables* son aquellas palabras que se inventan los comerciantes con el propósito de utilizarlas como marcas, como por ejemplo las marcas Xerox y Kodak. Véanse: *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5to Cir. 1983); *Eastman Kodak Co. v. Weil*, 243 N.Y.S. 319 (1930). Por otro lado, el término arbitrario se refiere a palabras comunes u ordinarias que no sugieren o describen los servicios

envueltos. Por ejemplo, "Ivory" aplicado a un jabón. *Zatarains Inc. v. Oak Grove Smokehouse Inc.*, ante, pág. 791.

Las *marcas sugestivas* son aquellas que sugieren mediante un esfuerzo de la imaginación del consumidor alguna característica del producto. *Coach House Restaurant v. Coach and Six Restaurants*, 934 F.2d 1551 (11mo Cir. 1991); *Colgate–Palmolive v. Mistolín*, ante. A manera de ilustración, la marca "Caesars Palace" como marca de un hotel se consideró sugestiva por sugerir la opulencia del hotel y el slogan "hace feliz a su nariz" para un limpiador. Véanse: *Caesars World, Inc. v. Caesars Palace, Inc.*, 179 U.S.P.Q. 14 (D.C. Neb. 1973), y *Colgate-Palmolive v. Mistolín*, ante, pág. 327. Las marcas arbitrarias o imaginables y las sugestivas están sujetas a protección para el uso exclusivo del que las reclama.

Una *marca descriptiva*, la cual identifica características o cualidades de un producto o servicio, puede llegar a ser de uso exclusivo únicamente si dicha marca ha adquirido un *significado secundario. Park'n Fly, Inc. v. Dollar Park and Fly, Inc.*, pág. 194. *Se obtiene el significado secundario cuando el consumidor asocia la marca con los bienes de un producto en particular.* Véase *Cooperativa Cafeteros v. Colón Colón*, ante, pág. 387. A manera de ejemplo, las siguientes marcas han sido catalogadas como descriptivas: Café Rico; "Dry Fry" usado como marca de un roseador para freir sin aceite; "Nu-Enamel", para esmalte de uñas. Véanse: *Cooperativa Cafeteros v. Colón Colón*, ante, pág. 385; *Armstrong Co. v. Nu-Enamel*, ante.

Por otro lado, "[u]n *término genérico* es uno que se refiere al género o clase dentro del cual un producto en particular es un espécimen". (Traducción nuestra y énfasis suplido.) *Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.*, ante, pág. 194. El término genérico es aquél que el público consumidor denomina o conoce como nombre común del

género y no de un producto de una fuente particular. Véase *Colón v. Carlos Martínez, Inc.*, 112 D.P.R. 846 (1982). Una marca genérica, no importa el significado secundario que tenga, no puede ser utilizada exclusivamente por persona o institución alguna si se usa para identificar un producto o servicio de dicho género. A esos efectos, nos señala J.T. McCarthy que "Generic Mark communicates information about nature or class of article or service and therefore can never become service or trademark". J.T. McCarthy, *Trademarks and Unfair Competition*, 2da ed., 1984, Sec. 15.1 (c), pág. 658. Véanse: *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2do Cir. 1976); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 304 (3er Cir. 1986); *Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5 (1er Cir. 1981). *WSM, Inc. v. Hilton*, 724 F.2d 1320 (8vo Cir. 1984). Añade el distinguido autor que "Once determined to be generic, no amount of purported evidence of secondary meaning can serve to give legal protection to the generic term". McCarthy, *op. cit.*

El término genérico pertenece al dominio público y puede ser utilizado por cualquier persona para identificar el producto y servicio de ese género. Cualquier término, aunque sea arbitrario, puede convertirse en genérico a través de su uso. *Colgate-Pamolive v. Mistolín*, ante, pág. 327; *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 374 (1er Cir. 1980). La determinación de si una marca se ha convertido en "genérica" se hace a base del significado primario que le da la mayoría de los consumidores a determinada marca de un producto o servicio.

> The primary significance of the registered mark to the relevant public ... shall be the test for determining whether the registered mark has become the common descriptive name of goods or services in connection with which it has been used .... Lanham Trademark Act., Sec. 14 (c) 15 U.S.C. sec. 1064(c).

Algunos términos que se han considerado por los tribu-

nales como nombres genéricos son: aspirin, [4] *shredded wheat*,[5] *thermos*,[6] entre otros. Véase, además, *Keebler Co. v. Rovira Biscuit Corp.*, ante, en donde se determina que la marca *export soda* era genérica en Puerto Rico, ya que se demostró que el consumidor puertorriqueño denominaba *una clase* de galleta por dicho nombre. Por otro lado, en *Trump v. Caesars World, Inc.*, 645 F. Supp. 1015 (D. N.J. 1986) se estableció que la palabra "Palace" no es genérica cuando se usa para identificar un casino o un hotel, ya que en este aspecto es usado de manera metafórica.

El demandado recurrente alega en el caso ante nos que "Plaza" o "Plaza Club" son términos genéricos y que, en consecuencia, erró el tribunal de instancia al determinar que no lo son por, alegadamente, tener éstos un significado secundario. Fundamenta el recurrente su alegación en el proliferado uso de la palabra Plaza y "Plaza Club", tanto en la industria hotelera como fuera de ella.

## III

La categorización de una palabra o frase en derecho marcario se examina a base de la relación entre el producto o servicio y la marca en cuestión y a base del mercado a quien va dirigido el producto. Una palabra puede ser genérica para determinado producto o servicio por determinar su género, mas puede ser descriptiva o arbitraria para otros. Por otro lado, puede que una palabra sea genérica para determinado mercado, mas no para otros. Véanse: *Keebler Co. v. Rovira Biscuit Corp.*, ante; *Colón v. Carlos Martínez, Inc.*, ante.

Debido a que los consumidores del servicio en cuestión

---

[4] *Bayer Co. v. United Drug Co.*, 272 F. Supp. 505 (S.D. N.Y. 1921).

[5] *Kellogg Co. v. Nat. Biscuit Co.*, 305 U.S. 111 (1938).

[6] *King-seeley Thermos Co. v. Alladin Industries, Inc.*, 321 F.3d 577 (2do Cir. 1963).

son mayormente de los Estados Unidos y es a ese mercado a quien se dirige la promoción del producto, es altamente relevante el significado primario que se da en este mercado a la palabra "Plaza".[7]

A estos fines, el diccionario resulta de gran ayuda. El mismo constituye "evidencia apropiada y relevante" para determinar el significado primario de un término. *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 11 (5to Cir. 1974); *Zatarains. v. Oak Grove Smokehouse, Inc.,* ante, pág. 792. El *Diccionario de la Lengua Española,* 20ma ed., brinda varias definiciones para la palabra "plaza"; entre ellas, la define como un "[l]ugar ancho y espacioso dentro de poblado", o aquél donde "se venden los mantenimientos y se tiene el trato común de los vecinos y comarcanos, y donde se celebran las ferias, los mercados y fiestas públicas". Debe mantenerse presente, sin embargo, que aun cuando el término "plaza" tenga su origen en el lenguaje español, el mismo se ha "adoptado" en el lenguaje inglés, definiéndose el mismo como, "an open square or market place in a city or town for the use of the public". *Webster's New Universal Unabridge Dictionary,* 2da ed., Nueva York, Ed. Dorset y Barber, 1983, pág. 1377. Véase, además, *The American Heritage Dictionary,* 2da ed., Boston, Ed. Houghton Mifflin Co. 1985, pág. 951.

Conforme a lo expuesto, dicha palabra no corresponde, por definición, al servicio que ofrecen estos hoteles. La palabra "plaza" denota un sitio público donde la gente se reúne ya sea a comprar o socializar. Los servicios que estos hoteles ofrecen en el *concierge level* son servicios exclusivos, con atenciones especiales, a cierto tipo de clientela. La palabra "Plaza" o la frase "Plaza Club" tomada en su totalidad, no determina *ni significa* el género del servicio que ofrece el Condado Plaza Hotel.

---

[7] Debe señalarse que los demandantes recurridos realmente no objetan el uso de la palabra "Club".

Tampoco ha quedado demostrado que los consumidores utilizen los términos "Plaza" o "Plaza Club" para denominar el género del servicio en cuestión que ofrecen los hoteles. Ambas partes coinciden que estos servicios se conocen comúnmente en la industria hotelera como *concierge level*. Aunque es cierto que la palabra "Plaza", como "Plaza Club", son usadas en el mercado norteamericano y puertorriqueño como marca de diversos productos o servicios, dicha circunstancia por sí sola no la convierte en una marca genérica. Sin embargo, y conforme veremos más adelante, el uso proliferado de cierta palabra tiene el efecto de disminuir la probabilidad de confusión.

La frase "Plaza Club" tampoco es un término descriptivo ya que de él no se desprende claramente ninguna característica ni cualidad del servicio prestado por dichos hoteles.

Consecuencia de todo lo anteriormente expuesto resulta ser que los términos "Plaza o Plaza Club" *no* son "marcas genéricas o descriptivas" del servicio particular en controversia que prestan los hoteles y que comúnmente se conoce, en el negocio hotelero, como *concierge level*. Forzoso resulta ser la conclusión, en consecuencia, que los referidos términos pueden ser objeto de apropiación y de uso exclusivo de alguna persona o institución si se determina que los mismos "identifican" el *servicio particular* que presta dicha persona o institución y que ésta lo utilizó primero.

## IV

Es doctrina establecida por este Tribunal que ese derecho propietario le pertenece al que primero utilice el nombre en conexión con su producto o servicio en la jurisdicción que ofrece la protección jurídica, en este caso Puerto Rico. Véanse: *Colgate-Palmolive v. Mistolín*, ante; *Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.*, ante. En el caso de autos ambas partes coinciden que Condado Plaza fue *el primero* en utilizar en Puerto Rico el término "Plaza Club"

para denominar el servicio ofrecido por ambos hoteles. Entendemos, en consecuencia, que el Hotel Condado Plaza tiene un "derecho propietario" sobre dicha marca.

*Ahora bien, existe una violación o infracción a ese derecho propietario de marca de fábrica o servicio, únicamente si la marca utilizada posteriormente por un competidor u otro comerciante crea una probabilidad de confusión al consumidor con respecto a la marca protegida.* El propósito de evitar que exista confusión entre dos (2) marcas es no tan solo evitar una competencia desleal hacia el primer usuario de la marca, sino también en protección del público consumidor, esto es, que éste pueda distinguir eficientemente entre un sinnúmero de productos o servicios similares.[8] La Ley de Marcas de Fábrica de Puerto Rico vigente contempla, en su Sec. 4, esta figura al establecer que no se registrará una marca de fábrica "que sea *muy probable* que ocasione confusión o equivocación en la mente del público ...". (Énfasis suplido.) 10 L.P.R.A. sec. 194.

El criterio (*test*) a seguir es relativamente sencillo: cuando un comprador prudente y razonable puede comprar un producto bajo la creencia que está comprando otro producto, existe la probabilidad de confusión.[9] La confusión sobre el origen de un producto no tiene que envolver productos o servicios idénticos; es suficiente que compitan entre sí o que estén relacionados en una manera que pueda implicar un origen común. *Callman*, ante, Vol. 3A, Sec. 20.02 (1988).[10]

---

[8] J.T. McCarthy, *Trademarks and Unfair Competition*, 2da ed., 1984, Sec. 2.1, pág. 47; *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208 (2do Cir. 1985).

[9] *Fonalledas v. Las Monjas Dairy Corp.*, 63 D.P.R. 87 (1944); McCarthy, *op. cit.*, Sec. 24.1 pág. 160; 3A *Callman, The Law of Unfair Competition, Trademarks and Monopolies* Secs. 20.01–20.03 (1988).

[10] Otro tipo de confusión puede consistir en que la similaridad de las marcas sobre productos o servicios relacionados sugiera erróneamente alguna clase de *afiliación* entre el demandante y el demandado. Esta confusión procede de la creencia

■ La confusión necesaria para establecer una infracción de marcas tiene que ser probable. Una mera posibilidad de confusión *no* es suficiente para emitir el *injunction. Callman*, ante, Vol. 3A, Sec. 20.07, pág. 31 (1988); *Colgate-Palmolive v. Mistolín*, ante. *Swarthmore Classics, Inc. v. Swarthmore Junior*, 81 F. Supp. 917 (S.D. N.Y. 1949); *Selchow & Righter Co. v. Decipher, Inc.*, 598 F. Supp. 1489 (E.D. Va. 1984); *AMP Inc. v. Foy*, 540 F.2d 1181 (4to Cir. 1976); *WSM, Inc. v. Hilton*, ante; *Fisher Stoves, Inc. v. All Nighter Stove Works*, 626 F.2d 193 (1er Cir. 1980); *Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons* 523 F.2d 1331 (2do Cir. 1975). Véase, además, 10 L.P.R.A. sec. 194. El tribunal de instancia erróneamente concluyó que la *mera* posibilidad de confusión es suficiente para expedir un *injunction* por infracción de marcas.

■ Un *examen integral* de las distintas expresiones de este Tribunal en *J. Beléndez Solá, Inc. v. Rivera*, 102 D.P.R. 276 (1974); *Cooperativa de Cafeteros v. Colón*, ante, *Colgate-Palmolive v. Mistolín*, ante, pág. 332; y, sobre todo, lo estatuido en la antes citada Sec. 4 de la Ley de Marcas de Fábrica de Puerto Rico vigente en nuestra jurisdicción, nos convence de que la norma debe ser a los efectos de que *no* es suficiente la *mera* posibilidad de confusión *y que se requiere que la confusión sea una probable*. A la luz de lo antes expuesto, resolvemos que erró el tribunal de instancia al determinar que existía en el presente caso una infracción de marcas por razón de la existencia de la mera posibilidad de confusión. Resulta, en consecuencia, necesario determinar si el demandante demostró, a través de la

---

de que el primer usuario de la marca promociona, autoriza o está en alguna manera relacionada con los productos o servicios del segundo usuario, aunque el público reconozca que el primer usuario no vende directamente los servicios o productos del segundo usuario. M.J. Allen, *Who Must be Confused and When?: The Scope of Confusion Actionable Under Federal Trademark Law*, 81 Trademark Rep. 209, 215 (1991); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 398 (8vo Cir. 1987); *WSM, Inc. v. Hilton*, 724 F.2d 1320 (8vo Cir. 1984).

prueba que presentara ante el tribunal de instancia, que existía una *probabilidad* de confusión. Veamos.

## V

En primer lugar, tenemos que señalar que no existe una norma precisa para poder determinar la existencia de probabilidad de confusión entre dos (2) productos o servicios. Este es un *concepto relativo* que se determina según las circunstancias de cada caso en particular, basándose la determinación que sobre ello se haga en un *balance* de los factores o criterios desarrollados jurisprudencialmente. Algunos de estos criterios son: la similaridad entre las marcas; similaridad de los productos o servicios; la fuerza de la marca o su distintivo; la intención del segundo usuario al adoptar la marca de servicio y, evidencia de confusión actual o real. *Callman*, ante, Vol. 3A, Sec. 20.07, pág. 32 (1988); M.H. Bierman y J.D. Wexler, *Toward a Reformulation of the Test for Determining Trademark Infringement*, 80 Trademark Rep. 1, 2–3 y 30–35 (1990), y casos allí citados.[11] Examinemos, entonces, la aplicación de estos factores al caso de autos.

### A. *Fuerza de las marcas*

Un factor vital en la determinación de confusión entre dos (2) marcas de servicio es la "fuerza o debilidad" de la marca del demandante. *Mientras más "débil" sea la marca menos probable es la confusión.*

La "fuerza" de una marca depende de su distintivo o la tendencia de identificar los servicios ofrecidos bajo una marca como pertenecientes a, o provenientes de, una fuente en particular. Por lo tanto, la evidencia de que la marca es *extensamente* utilizada por terceros en la misma

---

[11] Se aclara que la referida enumeración no es una exhaustiva.

industria es altamente relevante para demostrar la "debilidad" de una marca o su falta de distintivo. *Sun Banks of Fla. v. Sun Fed. Sav. & Loan*, 651 F.2d 311 (5to Cir. 1981); *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445 (5to Cir. 1973); *Kinark Corp. v. Camelot, Inc.*, 548 F. Supp. 429 (D. N.J. 1982).

■ La "fuerza o debilidad" de una marca determina el grado de protección a brindarse a la marca sobre otras similares. La marca "fuerte" tiene una mayor esfera de protección mientras que la protección de una marca "débil" estará limitada a evitar que productos o servicios *estrechamente* relacionados utilicen marcas similares. Existe probabilidad de confusión entre dos (2) marcas, aunque sean "débiles", si sus nombres y productos o servicios son iguales.

En Puerto Rico sólo el Condado Plaza y el Sands Hotel son los que utilizan el término "Plaza Club" para denominar sus servicios de *concierge levels*. Sin embargo, como el mercado para este servicio proviene mayormente de los Estados Unidos, tenemos que determinar la "fuerza o debilidad" de la marca "Plaza o Plaza Club" desde el punto de vista de dicho mercado. Vandenburgh, *op. cit.*, págs. 79–80; *Gucci America, Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060 (S.D. N.Y. 1991).

■ La parte demandada recurrente, tanto mediante prueba documental como testifical, demostró el *proliferado uso* de la palabra "Plaza" en la industria hotelera. En la misma dicha palabra se utiliza en nombres de hoteles tanto en Puerto Rico como a nivel internacional. Los *propios* testigos de la parte demandante, el Sr. Hugh Andrews y la Sra. Consuelo McMurray, *admitieron* que seleccionaron el término "Plaza" porque el mismo "es usado por muchos hoteles mundialmente conocidos y tiene un significado en el mercado hotelero muy bueno". La prueba documental de la recurrente reveló que hay en Estados

Unidos 114 instancias del uso de la palabra Plaza en la industria hotelera.[10] Además, quedó demostrado por la recurrente que el nombre "Plaza Club" se utiliza en relación con la industria hotelera, en situación similar a la del Hotel demandante, por las cadenas hoteleras Raddison, Holiday Inn, Sands y Pickett, Inns of Americas Hotel. En adición, tenemos que la parte recurrente demostró que dicho término es muy utilizado en productos y servicios *no* relacionados con la industria hotelera tales como clubes nocturnos, clubes de fisicultura y de tennis, por restaurantes, y centros comerciales. Concluimos, en consecuencia, que la marca "Plaza Club" en el caso de autos *es una "débil"*.

## B. *Similitud de las marcas*

Para que se establezca una *probabilidad* de confusión, es necesario que exista una *similitud* de las marcas aunque este factor, por sí solo, no ocasione dicha confusión. El *grado de similitud* entre las marcas se determina comparando ambas marcas en su totalidad. *Cooperativa Cafeteros v. Colón Colón*, ante. Las marcas no tienen que ser idénticas para que se constituya una infracción de marca. Es suficiente que la parte sustancial o dominante de la marca sea copiada o imitada. *Jordan K. Rand, Ltd. v. Lazoff Bros. Inc.*, ante; *Gilbert/Robinson v. Carrie Beverage-Missouri*, ante. Se ha establecido, por jurisprudencia federal, que la adición de un nombre a una marca idéntica a la otra usualmente no destruye o elimina la probabilidad de confusión. *Callman*, ante, Vol. 3A, Sec. 20.37, pág. 314 (1988). Sin embargo, si el nombre es tan conocido que se convierte en la parte dominante de la marca puede que elimine la probabilidad de confusión no tan sólo del origen

---

[10] Ese hecho, de por sí no convierte a dicho término en genérico. Como expresáramos anteriormente, la determinación de si una marca se ha convertido o no en genérica *se hace a base del significado primario que le da al mismo la mayoría de los consumidores*.

sino de afiliación o conexión. *Callman*, ante. Una adición de un nombre a una marca puede ser suficiente para evitar la confusión dependiendo de la fuerza de la parte principal de la marca y del distintivo del nombre adicional. "Where a trademark is itself weak, minor additions may effectively negate any confusing similarity." 3 *Callman*, ante, Sec. 82.1 (i), pág. 722. Véase *Playboy Enterprises Inc. v. Chuckleberry Pub.*, 486 F. Supp. 414 (S.D. N.Y. 1980).

Las marcas Plaza Club y Sands Plaza Club sólo difieren en la palabra Sands, la cual indica el origen de la fuente de dicho servicio. El demandado recurrente alega que el vocablo Sands es suficientemente conocido, lo que evita que se cause una confusión entre ambas marcas. Entendemos que le asiste la razón. Al determinar que Plaza Club es una marca débil y poco distintiva hay que reconocer que el vocablo Sand's es lo suficientemente fuerte para lograr una distinción entre ambas marcas que evita la confusión en los consumidores; más aun, cuando las promociones de estos servicios siempre van acompañadas del nombre del hotel que los ofrece.

## C. *Similitud de los servicios prestados*

■ Mientras más cercana sea la similitud entre dos (2) productos o servicios más probabilidad existe de que se cree confusión. Además de la similaridad en productos o servicios, hay que tener presente la proximidad del mercado y territorio a que van dirigidos. No se requiere que el servicio o su mercado sean idénticos, pero sí, que sean lo suficientemente similares que hagan hacer creer al público que ambos tienen un origen o una afiliación común.

En el caso de autos, ambos servicios van dirigidos a brindarles, en áreas designadas del hotel, unas atenciones y comodidades especiales a ciertos huéspedes del hotel conocido en la industria hotelera como un *concierge level*. El

recurrente alega, sin embargo, que hay distinciones en cuanto al mercado, decoración y el precio de ambas facilidades. Este no pudo demostrar, exitosamente ante el tribunal de instancia su alegación de que su producto iba dirigido a un mercado distinto. El propio gerente general del Hotel Sands declaró que, aun cuando la mayoría de sus clientes son jugadores profesionales de casino, las facilidades del Sands Plaza Club estaban disponibles para todo aquel que pueda pagar la tarifa correspondiente. Más aun, las promociones hechas por el Sands Plaza Club no hacen distinciones sobre mercado. Ambos hoteles promocionan sus facilidades de *concierge level* por medio de literatura directa a las agencias de viajes, y publican anuncios en revistas y periódicos en los Estados Unidos y en países extranjeros. Aunque este factor favorece a los demandantes, el mismo, por sí solo, no establece una probabilidad de confusión.

D. *Intención del segundo usuario*

La intención del segundo usuario en adoptar una marca con el propósito de engañar al público para obtener beneficio de la reputación de su competidor, es un factor relevante que ayuda a establecer la probabilidad de confusión. Sin embargo, este factor pierde importancia si otros hechos demuestran que no hay tal confusión.

El presidente del Hotel Sands, al momento de abrirse el "Plaza Club" del demandante Condado Plaza, tenía un interés propietario en el referido Hotel. Hasta el 1983, él era Presidente de Posadas Associates S.A. que, a su vez, era dueña de un 25% de dicho Hotel. Dicho ejecutivo, obviamente, tenía conocimiento del progreso y éxito que tuvo dicho concepto innovador en Puerto Rico. Ello, *por sí solo*, no es suficiente para imputarle la intención o propósito de engañar al público y gozar del beneficio de la reputación

del competidor. *GTE Corp. v. Williams*, 904 F.2d 536 (10mo Cir. 1990). El tribunal de instancia no determinó que hubiese tal intención.

### E. *Confusión actual*

Evidencia de confusión actual no es necesaria para demostrar infracción de marcas aunque constituiría la mejor evidencia para demostrar que existe una probabilidad de confusión. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5to Cir. 1980); *Helen Curtis Industries v. Church & Dwight Co.*, 560 F.2d 1325 (7mo Cir. 1977); *Sun-Fun Products v. Suntan Research & Development*, 656 F.2d 186 (5to Cir. 1981); *American Intern. Group v. American Intern. Bank*, 926 F.2d 829 (9no Cir. 1991). En el caso de autos ninguna de las partes produjo evidencia sobre la existencia o ausencia de confusión actual o real de los consumidores, por lo que prescindimos de este factor para la presente determinación.

## VI

Haciendo un balance de los factores antes expuestos, *concluimos que la parte demandante no demostró que existiera una probabilidad de confusión entre ambas marcas.* La palabra Plaza es muy usada en la industria hotelera y precisamente esa fue la razón por la que ellos la adoptaron. El hecho de que la parte demandada le añadiera el nombre distintivo "Sands" tuvo la consecuencia ulterior de impedir la existencia de confusión en la mente del consumidor.[11] En adición, las promociones y anuncios de estos servicios

---

[11] Véase *Plaza Co. v. White*, 160 S.W.2d 312 (1942), en donde se establece que el nombre White Plaza Hotel no crea confusión al nombre Plaza Hotel debido al proliferado uso de dicha palabra en la industria hotelera por lo que el público consumidor puede distinguirlas con la adición de otra palabra. Véase, además, *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445 (5to Cir. 1973), los cuales alegan el mismo resultado por las palabras Holiday y Camelot para la industria hotelera.

de *concierge level* siempre van acompañados del nombre del hotel que los ofrece. Este factor, unido a la diferencia en precio de ambos servicios, hace que el consumidor prudente y razonable pueda distinguirlas y evitar así la confusión del origen o afiliación de quien las provee.

Determinamos, en consecuencia, que el demandado recurrente no incurrió en una competencia desleal, debido a que una mera posibilidad de confusión no es suficiente para sostener la acción por él radicada y el demandante no demostró que fuera probable que el nombre Sands Plaza Club ocasionara confusión.

Por los fundamentos antes expuestos, *se revoca la sentencia dictada por el Tribunal Superior de Puerto Rico, Sala de Carolina. Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri emitió opinión concurrente. El Juez Asociado Señor Hernández Denton emitió opinión concurrente y disidente. El Juez Asociado Señor Negrón García se inhibió.

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton.

Concurrimos con la revocación de la sentencia recurrida por entender que en el caso de autos no procedía que se declarara con lugar la demanda y se emitiera un *injunction* permanente. Dicha determinación tendría el efecto de limitar la competencia en la industria hotelera de Puerto Rico.

No obstante, por entender que en Puerto Rico no existe legislación relativa a las marcas de servicio, no podemos suscribir los pronunciamientos del Tribunal de que el caso de autos debe resolverse "al amparo de la doctrina sobre competencia desleal o ilícita utilizando el análisis conte-

nido en las decisiones emitidas bajo la Ley de Marcas de Fábrica de Puerto Rico". Opinión mayoritaria, pág. 35. Esto constituye un acto de legislación judicial de un problema de naturaleza económica. Bajo nuestro ordenamiento constitucional esta función le corresponde a la Asamblea Legislativa.

Por otro lado, para proteger al consumidor de anuncios y prácticas engañosas, tanto la ley Orgánica del Departamento de Asuntos del Consumidor, 3 L.P.R.A. sec. 341 (j), como la Ley de Monopolios y Restricción del Comercio, 10 L.P.R.A. sec. 259, proveen amplios remedios estatales. Estas agencias tienen la experiencia, los conocimientos y los poderes para defender a las personas afectadas por anuncios y prácticas injustas del comercio.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Fuster Berlingeri.

Concurro con el resultado anunciado en la opinión de la mayoría de este Tribunal. En lo que a mí concierne, la parte demandante recurrida no ha establecido que tenga un derecho claro que justifique la concesión del remedio solicitado, que el foro de instancia le otorgó. Procede, por tanto, revocar la sentencia dictada por el Tribunal Superior, Sala de Carolina.

Sin embargo, no estoy conforme con los pronunciamientos doctrinales expuestos en la opinión mayoritaria. Estoy de acuerdo con que la particular versión de la Ley de Marcas de Fábrica de Puerto Rico que estaba vigente al ocurrir los hechos de este caso es de ámbito limitado y no se extiende a situaciones como la de autos, que trata con lo que la mayoría denomina "marcas de servicios". Pero tengo grandes reservas en cuanto a si nos corresponde a nosotros llenar esa laguna jurídica con extensos señalamientos nor-

mativos que equivalen a formular una política pública detallada sobre el particular. Esa función le corresponde primordialmente a la Asamblea Legislativa de Puerto Rico, sobre todo respecto a un asunto como el que tenemos ante nos, que puede ser preceptuado de varias maneras diversas, dependiendo de los valores e intereses económicos que se quieran favorecer, sin que existan requerimientos constitucionales que exijan adoptar unas alternativas sobre otras.

En su esencia, el asunto ante nuestra consideración precisa determinar en qué grado y bajo cuáles circunstancias una empresa comercial dedicada a servicios puede usar, con exclusión de cualquier otra parte, un distintivo que dicha empresa ha adoptado libremente. Se trata propiamente de dilucidar excepciones a las normas fundamentales que prohíben las prácticas monopolísticas y que regulan la libre competencia en una sociedad de mercado, *Trigo Hnos. v. Sobrino de Izquierdo*, 72 D.P.R. 449 (1951), tarea que es de naturaleza singularmente legislativa.

La ausencia de normas estatutarias que rijan la controversia particular que está ante nos ahora, claro está, no nos libra de la responsabilidad de adjudicar dicha controversia. Conocido es el mandato que nos exige resolver, aun cuando no haya ley aplicable al caso, conforme a equidad. Art. 7 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 7. Pero en tales situaciones, nuestra función debe limitarse a resolver escuetamente el caso concreto ante nos, por medio de la analogía jurídica. *Olmo v. Young & Rubicam of P.R., Inc.*, 110 D.P.R. 740 (1981). No nos corresponde preceptuar toda la materia en cuestión, mucho menos a base de pronunciamientos doctrinales controvertibles.

En el caso ante nos, la mayoría primero determina que la cuestión que ha de adjudicarse debe resolverse "al amparo de la doctrina sobre competencia desleal o ilícita ...". Opinión mayoritaria, pág. 35. Luego procede a reconocer que una persona o corporación puede tener derecho propie-

tario sobre marcas de servicio, entrando a señalar cómo se obtiene tal derecho, cuáles son sus atributos y limitaciones, y cómo se extingue dicho derecho. Pasa, entonces, la mayoría a dilucidar cuáles son los distintos tipos de marcas de servicio sobre las cuales puede o no recaer el derecho de propiedad antes reconocido, y cómo tal derecho también se ve afectado por el tipo de mercado a que va dirigido el servicio. Concluye la exposición normativa de la mayoría con unos pronunciamientos sobre la violación del derecho propietario de marca de servicio, dependiendo ésta de si hay probabilidad *versus* posibilidad de confusión al consumidor con respecto a la marca protegida; fijando además normas sobre cómo se determina la probabilidad de confusión entre dos (2) servicios.

Resulta evidente, pues, que la mayoría no sólo resuelve el caso concreto ante sí, como nos corresponde, sino que además deja sentada la "doctrina" que obligatoriamente regirá en casos como el de autos de ahora en adelante. Como he señalado ya, me parece que esta actuación de la mayoría rebasa innecesariamente el ámbito usual de nuestras facultades como Tribunal Supremo. Se hacen determinaciones normativas sobre varios aspectos del asunto que no sólo van más allá de lo necesario para resolver el caso ante nos, sino que implican juicios valorativos sobre cuestiones económicas que propiamente le compete hacer al legislador. Las determinaciones normativas aludidas no constituyen criterios estrictamente jurídicos. Aparejan preferencias de política económica, estén o no conscientes de ello los jueces de la mayoría.

I

Me preocupa también que los pronunciamientos normativos en cuestión no son todos inexpugnables, aun desde la perspectiva estricta de lo jurídico. Tomemos por ejemplo la determinación de la mayoría de que este caso debe resol-

verse al amparo de la doctrina sobre competencia desleal o ilícita. En Puerto Rico, como jurisdicción civilista que en gran parte somos, rige el principio de que en las materias que se rijan por leyes especiales, la deficiencia de éstas se suplirá por las disposiciones del Código Civil. Art. 12 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 12. El Código Civil constituye legislación supletoria para las leyes especiales tales como las mercantiles. *Sucn. Evans v. Srio. de Hacienda*, 108 D.P.R. 713 (1979); *Agulló v. ASERCO*, 104 D.P.R. 244 (1975); *Robles v. Tribunal*, 85 D.P.R. 665 (1962). El problema decisorio de este caso surge del hecho de que una ley especial de naturaleza mercantil, la Ley de Marcas de Fábrica de Puerto Rico, según estaba vigente al surgir este caso, no considera las llamadas "marcas de servicio". Se trata, pues, de una situación claramente cubierta por el mandato de que el Código Civil es la base para resolver. Sin embargo, la mayoría del Tribunal invoca una "doctrina" de competencia desleal, sin explicar claramente por qué es tal doctrina y no el Código Civil la fuente para resolver. Ciertamente no se intenta dilucidar si tal doctrina es de arraigo civilista. Tampoco se discute si la llamada doctrina de competencia desleal guarda alguna relación con la disposición legislativa de Puerto Rico que prohíbe la competencia injusta en general —que es el Art. 3 de nuestra Ley sobre Monopolios y Restricción del Comercio, 10 L.P.R.A. sec. 259— o si guarda alguna relación con la prohibición de anuncios engañosos o erróneos que forma parte de nuestra legislación que protege al consumidor (23 L.P.R.A. sec. 1014).

Acudir a la "doctrina" de competencia desleal presenta otro problema fundamental. No está claro por qué rige tal "doctrina" en Puerto Rico. *¿De dónde surge la obligatoriedad de tal "doctrina"? ¿Qué mandato legislativo o constitucional la hace vinculante?* La opinión mayoritaria dice que tal "doctrina" ha sido aceptada y aplicada por el Tribunal anteriormente y cita cuatro (4) decisiones previas

nuestras. Pero resulta que si se examinan esas cuatro (4) decisiones cuidadosamente se encontrará que *ninguna de ellas discute dicha "doctrina"*. Ninguna de las cuatro (4) decisiones aludidas va más allá de meramente *mencionar* la frase "competencia desleal" o "competencia ilícita". No se expone de modo alguno el contenido de la llamada "doctrina" ni se explica satisfactoriamente de dónde procede o por qué debe adoptarse en Puerto Rico. No hay en ninguna de ellas un ápice de justificación de por qué es vinculante en nuestra jurisdicción. La más reciente de las cuatro (4) decisiones, *Colgate-Palmolive v. Mistolín*, 117 D.P.R. 313 (1986), menciona las frases aludidas *in passim*, citando fuentes de derecho norteamericano. La próxima decisión, *Reynal v. Tribunal Superior*, 102 D.P.R. 260 (1974), menciona la frase una vez y cita como fuente las otras dos (2) decisiones anteriores. La más próxima de estas dos (2), *Cooperativa Cafeteros v. Colón Colón*, 91 D.P.R. 372 (1964), acude al concepto de "competencia desleal" citando casos de Estados Unidos y citando también la primera decisión de este Tribunal que había usado la frase, *Eneglotaria Medicine Co. v. Sosa López*, 38 D.P.R. 604 (1928). Y en esa primera decisión, escrita por el Juez Asociado Adolph Wolf, se usa la frase "competencia ilegal" citando casos federales, sin explicación alguna de por qué en Puerto Rico los tribunales nuestros deben considerar una causa de acción por competencia ilegal de origen anglosajón. Ésa, sucintamente, es la historia jurídica de la "doctrina" en cuestión: se importa una frase de la jurisprudencia federal sin ton ni son, y se perpetúa mediante la aplicación mecánica del precedente cual mágico talismán, dándole en una de las cuatro (4) escasas y escuetas decisiones el nombre de "causa de acción", en otra el de "teoría" y finalmente ahora, por la mayoría, el de "doctrina".

Debe señalarse que la mayoría, aunque se ampara en la aludida "doctrina" de competencia desleal, no explica cómo

y por qué de dicha "doctrina" surgen o se deducen los extensos señalamientos normativos que luego se pronuncian. La mayoría invoca la llamada "doctrina" al principio de la opinión pero luego no vuelve a mencionarla en ningún otro lugar de exposición normativa ni indica de modo alguno cuál es la relación de dicha "doctrina" con los detallados pronunciamientos formulados por la mayoría, que se fundamentan esencialmente en jurisprudencia norteamericana.

La fragilidad que para mí tiene la llamada "doctrina" de competencia desleal, como base para la decisión de la mayoría, no es el único problema que ésta presenta desde el punto de vista estrictamente jurídico. Existen otros, como es, por ejemplo, la manera en que la mayoría trata con la cuestión de la confusión necesaria para establecer una infracción del derecho sobre una marca. La mayoría nos dice que un "examen integral de las distintas expresiones de este Tribunal ... nos convence de que la norma debe ser ... que no es suficiente la mera posibilidad de confusión y que se requiere que la confusión sea una probable". Sin embargo, este Tribunal en *J. Beléndez Solá, Inc. v. Rivera,* 102 D.P.R. 276, 278 (1974), y en *Cooperativa Cafeteros v. Colón Colón,* supra, expresamente resolvió que en casos donde se alega infracción a la Ley de Marcas de Fábrica de Puerto Rico "basta probar la posibilidad de confusión, sin que haya que probar que ésta se produjo de hecho". ¿Está la mayoría ahora revocando a *J. Beléndéz Solá, Inc. v. Rivera,* supra, y a *Cooperativa Cafeteros v. Colón Colón,* supra? ¿Cuál es el "examen integral" que lleva a un resultado directamente contrario a los precedentes? ¿Cómo se armoniza el dictamen de ahora con el de las decisiones anteriores de este Foro?

Las razones anteriores ejemplifican por qué no estoy conforme con la opinión de la mayoría, por lo que debo limitar mi voto a concurrir con el resultado.